(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ALABAMA LEGISLATIVE BLACK CAUCUS ET AL. *v.* ALABAMA ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA

No. 13–895. Argued November 12, 2014—Decided March 25, 2015*

In 2012 Alabama redrew the boundaries of the State's 105 House districts and 35 Senate districts. In doing so, while Alabama sought to achieve numerous traditional districting objectives—*e.g.,* compactness, not splitting counties or precincts, minimizing change, and protecting incumbents—it placed yet greater importance on two goals: (1) minimizing a district's deviation from precisely equal population, by keeping any deviation less than 1% of the theoretical ideal; and (2) seeking to avoid retrogression with respect to racial minorities' "ability to elect their preferred candidates of choice" under §5 of the Voting Rights Act of 1965, 52 U. S. C. §10304(b), by maintaining roughly the same black population percentage in existing majority-minority districts.

Appellants—Alabama Legislative Black Caucus (Caucus), Alabama Democratic Conference (Conference), and others—claim that Alabama's new district boundaries create a "racial gerrymander" in violation of the Fourteenth Amendment's Equal Protection Clause. After a bench trial, the three-judge District Court ruled (2 to 1) for the State. It recognized that electoral districting violates the Equal Protection Clause when race is the "predominant" consideration in deciding "to place a significant number of voters within or without a particular district," *Miller* v. *Johnson*, 515 U. S. 900, 913, 916, and the use of race is not "narrowly tailored to serve a compelling state interest," *Shaw* v. *Hunt*, 517 U. S. 899, 902 (*Shaw II*).

In ruling against appellants, it made four critical determinations:

———————

*Together with No. 13–1138, *Alabama Democratic Conference et al*. v. *Alabama et al*., also on appeal from the same court.

Syllabus

(1) that both appellants had argued "that the Acts *as a whole* constitute racial gerrymanders," and that the Conference had also argued that the State had racially gerrymandered Senate Districts 7, 11, 22, and 26; (2) that the Conference lacked standing to make its racial gerrymandering claims; (3) that, in any event, appellants' claims must fail because race "was not the predominant motivating factor" in making the redistricting decisions; and (4) that, even were it wrong about standing and predominance, these claims must fail because any predominant use of race was "narrowly tailored" to serve a "compelling state interest" in avoiding retrogression under §5.

*Held*:

1. The District Court's analysis of the racial gerrymandering claim as referring to the State "as a whole," rather than district-by-district, was legally erroneous.  Pp. 5–12.

(a) This Court has consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*, see, *e.g.*, *Shaw* v. *Reno*, 509 U. S. 630, 649 (*Shaw I*), and has described the plaintiff's evidentiary burden similarly, see *Miller*, *supra*, at 916. The Court's district-specific language makes sense in light of the personal nature of the harms that underlie a racial gerrymandering claim, see *Bush* v. *Vera*, 517 U. S. 952, 957; *Shaw I, supra,* at 648. Pp. 5–6.

(b) The District Court found the fact that racial criteria had not predominated in the drawing of some Alabama districts sufficient to defeat a claim of racial gerrymandering with respect to the State *as an undifferentiated whole*.  But a showing that race-based criteria did not significantly affect the drawing of *some* Alabama districts would have done little to defeat a claim that race-based criteria predominantly affected the drawing of *other* Alabama districts.  Thus, the District Court's undifferentiated statewide analysis is insufficient, and the District Court must on remand consider racial gerrymandering with respect to the individual districts challenged by appellants. Pp. 7–8.

(c) The Caucus and the Conference did not waive the right to further consideration of a district-by-district analysis.  The record indicates that plaintiffs' evidence and arguments embody the claim that individual majority-minority districts were racially gerrymandered, and those are the districts that the District Court must reconsider. Although plaintiffs relied heavily upon statewide evidence to prove that race predominated in the drawing of individual district lines, neither the use of statewide evidence nor the effort to show widespread effect can transform a racial gerrymandering claim about a set of individual districts into a separate, general claim that the leg

islature racially gerrymandered the State "as" an undifferentiated "whole." Pp. 8–12.

2. The District Court also erred in deciding, *sua sponte,* that the Conference lacked standing. It believed that the "record" did "not clearly identify the districts in which the individual members of the [Conference] reside." But the Conference's post-trial brief and the testimony of a Conference representative support an inference that the organization has members in all of the majority-minority districts, which is sufficient to meet the Conference's burden of establishing standing. At the very least, the Conference reasonably believed that, in the absence of a state challenge or a court request for more detailed information, it need not provide additional information such as a specific membership list. While the District Court had an independent obligation to confirm its jurisdiction, in these circumstances elementary principles of procedural fairness required the District Court, rather than acting *sua sponte*, to give the Conference an opportunity to provide evidence of member residence. On remand, the District Court should permit the Conference to file its membership list and the State to respond, as appropriate. Pp. 12–15.

3. The District Court also did not properly calculate "predominance" in its alternative holding that "[r]ace was not the predominant motivating factor" in the creation of any of the challenged districts. It reached its conclusion in part because it placed in the balance, among other nonracial factors, legislative efforts to create districts of approximately equal population. An equal population goal, however, is not one of the "traditional" factors to be weighed against the use of race to determine whether race "predominates," see *Miller, supra*, at 916. Rather, it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to *how* equal population objectives will be met. Had the District Court not taken a contrary view of the law, its "predominance" conclusions, including those concerning the four districts that the Conference specifically challenged, might well have been different. For example, there is strong, perhaps overwhelming, evidence that race did predominate as a factor when the legislature drew the boundaries of Senate District 26. Pp. 15–19.

4. The District Court's final alternative holding—that "the [challenged] Districts would satisfy strict scrutiny"—rests upon a misperception of the law. Section 5 does not require a covered jurisdiction to maintain a particular numerical minority percentage. It requires the jurisdiction to maintain a minority's ability to elect a preferred candidate of choice. Pp. 19–23.

(a) The statute's language, 52 U. S. C. §§10304(b), (d), and Department of Justice Guidelines make clear that §5 is satisfied if mi-

Syllabus

nority voters retain the ability to elect their preferred candidates. The history of §5 further supports this view, as Congress adopted the language in §5 to reject this Court's decision in *Georgia* v. *Ashcroft*, 539 U. S. 461, and to accept the views of Justice Souter's dissent—that, in a §5 retrogression case, courts should ask whether a new voting provision would likely deprive minority voters of their ability to elect a candidate of their choice, and that courts should not mechanically rely upon numerical percentages but should take account of all significant circumstances, *id.,* at 493, 498, 505, 509. Here, both the District Court and the legislature relied heavily upon a mechanically numerical view as to what counts as forbidden retrogression. Pp. 19–22.

    (b) In saying this, this Court does not insist that a state legislature, when redistricting, determine *precisely* what percent minority population §5 demands. A court's analysis of the narrow tailoring requirement insists only that the legislature have a "strong basis in evidence" in support of the (race-based) choice that it has made. Brief for United States as *Amicus Curiae* 29. Here, however, the District Court and the legislature both asked the wrong question with respect to narrow tailoring. They asked how to maintain the present minority percentages in majority-minority districts, instead of asking the extent to which they must preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice. Because asking the wrong question may well have led to the wrong answer, the Court cannot accept the District Court's conclusion. Pp. 22–23.

989 F. Supp. 2d 1227, vacated and remanded.

    BREYER, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS and ALITO, JJ., joined. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### Nos. 13–895 and 13–1138

### ALABAMA LEGISLATIVE BLACK CAUCUS, ET AL., APPELLANTS
13–895                    *v.*
### ALABAMA ET AL.

### ALABAMA DEMOCRATIC CONFERENCE, ET AL., APPELLANTS
13–1138                    *v.*
### ALABAMA ET AL.

### ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA

### [March 25, 2015]

JUSTICE BREYER delivered the opinion of the Court.

The Alabama Legislative Black Caucus and the Alabama Democratic Conference appeal a three-judge Federal District Court decision rejecting their challenges to the lawfulness of Alabama's 2012 redistricting of its State House of Representatives and State Senate. The appeals focus upon the appellants' claims that new district boundaries create "racial gerrymanders" in violation of the Fourteenth Amendment's Equal Protection Clause. See, *e.g.*, *Shaw* v. *Hunt*, 517 U. S. 899, 907–908 (1996) (*Shaw II*) (Fourteenth Amendment forbids use of race as "'predominant'" district boundary-drawing "'factor'" unless boundaries are "narrowly tailored" to achieve a "'compelling state interest'" (citations omitted)). We find that the

District Court applied incorrect legal standards in evaluating the claims. We consequently vacate its decision and remand the cases for further proceedings.

## I

The Alabama Constitution requires the legislature to reapportion its State House and Senate electoral districts following each decennial census. Ala. Const., Art. IX, §§199–200. In 2012 Alabama redrew the boundaries of the State's 105 House districts and 35 Senate districts. 2012 Ala. Acts no. 602 (House plan); *id.,* at no. 603 (Senate plan) (Acts). In doing so, Alabama sought to achieve numerous traditional districting objectives, such as compactness, not splitting counties or precincts, minimizing change, and protecting incumbents. But it placed yet greater importance on achieving two other goals. See Alabama Legislature Reapportionment Committee Guidelines in No. 12–cv–691, Doc. 30–4, pp. 3–5 (Committee Guidelines).

First, it sought to minimize the extent to which a district might deviate from the theoretical ideal of precisely equal population. In particular, it set as a goal creating a set of districts in which no district would deviate from the theoretical, precisely equal ideal by more than 1%—*i.e.,* a more rigorous deviation standard than our precedents have found necessary under the Constitution. See *Brown* v. *Thomson*, 462 U. S. 835, 842 (1983) (5% deviation from ideal generally permissible). No one here doubts the desirability of a State's efforts generally to come close to a one-person, one-vote ideal.

Second, it sought to ensure compliance with federal law, and, in particular, the Voting Rights Act of 1965. 79 Stat. 439, as amended, 52 U. S. C. §10301 *et seq*. At the time of the redistricting Alabama was a covered jurisdiction under that Act. Accordingly §5 of the Act required Alabama to demonstrate that an electoral change, such as redistrict-

ing, would not bring about retrogression in respect to racial minorities' "ability . . . to elect their preferred candidates of choice." 52 U. S. C. §10304(b). Specifically, Alabama believed that, to avoid retrogression under §5, it was required to maintain roughly the same black population percentage in existing majority-minority districts. See Appendix B, *infra.*

Compliance with these two goals posed particular difficulties with respect to many of the State's 35 majority-minority districts (8 in the Senate, 27 in the House). That is because many of these districts were (compared with the average district) underpopulated. In order for Senate District 26, for example, to meet the State's no-more-than-1% population-deviation objective, the State would have to add about 16,000 individuals to the district. And, prior to redistricting, 72.75% of District 26's population was black. Accordingly, Alabama's plan added 15,785 new individuals, and only 36 of those newly added individuals were white.

This suit, as it appears before us, focuses in large part upon Alabama's efforts to achieve these two goals. The Caucus and the Conference basically claim that the State, in adding so many new minority voters to majority-minority districts (and to others), went too far. They allege the State created a constitutionally forbidden "racial gerrymander"—a gerrymander that (*e.g.*, when the State adds more minority voters than needed for a minority group to elect a candidate of its choice) might, among other things, harm the very minority voters that Acts such as the Voting Rights Act sought to help.

After a bench trial, the Federal District Court held in favor of the State, *i.e.*, against the Caucus and the Conference, with respect to their racial gerrymandering claims as well as with respect to several other legal claims that the Caucus and the Conference had made. With respect to racial gerrymandering, the District Court recognized that

electoral districting violates the Equal Protection Clause when (1) race is the "dominant and controlling" or "predominant" consideration in deciding "to place a significant number of voters within or without a particular district," *Miller* v. *Johnson*, 515 U. S. 900, 913, 916 (1995), and (2) the use of race is not "narrowly tailored to serve a compelling state interest," *Shaw II*, 517 U. S., at 902; see also *Shaw* v. *Reno*, 509 U. S. 630, 649 (1993) (*Shaw I*) (Constitution forbids "separat[ion of] voters into different districts on the basis of race" when the separation "lacks sufficient justification"); *Bush* v. *Vera*, 517 U. S. 952, 958–959, 976 (1996) (principal opinion of O'Connor, J.) (same). But, after trial the District Court held (2 to 1) that the Caucus and the Conference had failed to prove their racial gerrymandering claims. The Caucus along with the Conference (and several other plaintiffs) appealed. We noted probable jurisdiction with respect to the racial gerrymandering claims. 572 U. S. ___ (2014).

We shall focus upon four critical District Court determinations underlying its ultimate "no violation" conclusion. They concern:

1. *The Geographical Nature of the Racial Gerrymandering Claims.* The District Court characterized the appellants' claims as falling into two categories. In the District Court's view, both appellants had argued "that the Acts *as a whole* constitute racial gerrymanders," 989 F. Supp. 2d 1227, 1287 (MD Ala. 2013) (emphasis added), and one of the appellants (the Conference) had also argued that the State had racially gerrymandered four specific electoral districts, Senate Districts 7, 11, 22, and 26, *id.*, at 1288.

2. *Standing.* The District Court held that the Caucus had standing to argue its racial gerrymandering claim with respect to the State "as a whole." But the Conference lacked standing to make any of its

racial gerrymandering claims—the claim requiring consideration of the State "as a whole," and the claims requiring consideration of four individual Senate districts. *Id.*, at 1292.

3. *Racial Predominance.* The District Court held that, in any event, the appellants' claims must fail because race "was not the predominant motivating factor" either (a) "for the Acts as a whole" or (b) with respect to "Senate Districts 7, 11, 22, or 26." *Id.*, at 1293.

4. *Narrow Tailoring/Compelling State Interest.* The District Court also held that, even were it wrong about standing and predominance, the appellants' racial gerrymandering claims must fail. That is because any predominant use of race in the drawing of electoral boundaries was "narrowly tailored" to serve a "compelling state interest," *id.*, at 1306–1307, namely the interest in avoiding retrogression with respect to racial minorities' "ability to elect their preferred candidates of choice." §10304(b).

In our view, each of these determinations reflects an error about relevant law. And each error likely affected the District Court's conclusions—to the point where we must vacate the lower court's judgment and remand the cases to allow appellants to reargue their racial gerrymandering claims. In light of our opinion, all parties remain free to introduce such further evidence as the District Court shall reasonably find appropriate.

## II

We begin by considering the geographical nature of the racial gerrymandering claims. The District Court repeatedly referred to the racial gerrymandering claims as claims that race improperly motivated the drawing of boundary lines of the State *considered as a whole.* See, *e.g.*, 989 F. Supp. 2d, at 1293 ("Race was not the predomi-

nant motivating factor for the Acts as a whole"); *id.*, at 1287 (construing plaintiffs' challenge as arguing that the "Acts as a whole constitute racial gerrymanders"); *id.*, at 1292 (describing the plaintiffs' challenge as a "claim of racial gerrymandering to the Acts as a whole"); cf. *supra*, at 4–5 (noting four exceptions).

A racial gerrymandering claim, however, applies to the boundaries of individual districts. It applies district-by-district. It does not apply to a State considered as an undifferentiated "whole." We have consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts.* See, *e.g.*, *Shaw I*, 509 U. S., at 649 (violation consists of "separat[ing] voters *into different districts* on the basis of race" (emphasis added)); *Vera*, 517 U. S., at 965 (principal opinion) ("[Courts] must scrutinize *each challenged district . . .*" (emphasis added)). We have described the plaintiff's evidentiary burden similarly. See *Miller*, *supra*, at 916 (plaintiff must show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without *a particular district*" (emphasis added)).

Our district-specific language makes sense in light of the nature of the harms that underlie a racial gerrymandering claim. Those harms are personal. They include being "personally . . . subjected to [a] racial classification," *Vera*, *supra*, at 957 (principal opinion), as well as being represented by a legislator who believes his "primary obligation is to represent only the members" of a particular racial group, *Shaw I*, *supra*, at 648. They directly threaten a voter who lives in the *district* attacked. But they do not so keenly threaten a voter who lives elsewhere in the State. Indeed, the latter voter normally lacks standing to pursue a racial gerrymandering claim. *United States* v. *Hays*, 515 U. S. 737, 744–745 (1995).

Voters, of course, can present statewide *evidence* in order to prove racial gerrymandering in a particular district. See *Miller*, *supra*, at 916. And voters might make the claim that *every* individual district in a State suffers from racial gerrymandering. But this latter claim is not the claim that the District Court, when using the phrase "as a whole," considered here. Rather, the concept as used here suggests the existence of a legal unicorn, an animal that exists only in the legal imagination.

This is not a technical, linguistic point. Nor does it criticize what might seem, in effect, a slip of the pen. Rather, here the District Court's terminology mattered. That is because the District Court found that racial criteria had not predominated in the drawing of some Alabama districts. And it found that fact (the fact that race did not predominate in the drawing of some, or many districts) sufficient to defeat what it saw as the basic claim before it, namely a claim of racial gerrymandering with respect to the State *as an undifferentiated whole*. See, *e.g.*, 989 F. Supp. 2d, at 1294 (rejecting plaintiffs' challenge because "[the legislature] followed no bright-line rule" with respect to every majority-minority district); *id.*, at 1298–1299, 1301 (citing examples of majority-minority districts in which black population percentages were reduced and examples of majority-white districts in which precincts were split).

A showing that race-based criteria did not significantly affect the drawing of *some* Alabama districts, however, would have done little to defeat a claim that race-based criteria predominantly affected the drawing of *other* Alabama districts, such as Alabama's majority-minority districts primarily at issue here. See *id.*, at 1329 (Thompson, J., dissenting) ("[T]he drafters['] fail[ure] to achieve their sought-after percentage in one district does not detract one iota from the fact that they did achieve it in another"). Thus, the District Court's undifferentiated

statewide analysis is insufficient. And we must remand for consideration of racial gerrymandering with respect to the individual districts subject to the appellants' racial gerrymandering challenges.

The State and principal dissent argue that (but for four specifically mentioned districts) there were in effect no such districts. The Caucus and the Conference, the State and principal dissent say, did not seek a district-by-district analysis. And, the State and principal dissent conclude that the Caucus and the Conference have consequently waived the right to any further consideration. Brief for Appellees 14, 31; *post,* at 5–12 (opinion of SCALIA, J.).

We do not agree. We concede that the District Court's opinion suggests that it was the Caucus and the Conference that led the Court to consider racial gerrymandering of the State "as a whole." 989 F. Supp. 2d, at 1287. At least the District Court interpreted their filings to allege only that kind of claim. *Ibid.* But our review of the record indicates that the plaintiffs did not claim only that the legislature had racially gerrymandered the State "as" an undifferentiated "whole." Rather, their evidence and their arguments embody the claim that individual majority-minority districts were racially gerrymandered. And those are the districts that we believe the District Court must reconsider.

There are 35 majority-minority districts, 27 in the House and 8 in the Senate. The District Court's opinion itself refers to evidence that the legislature's redistricting committee, in order to satisfy what it believed the Voting Rights Act required, deliberately chose additional black voters to move into underpopulated majority-minority districts, *i.e.,* a specific set of individual districts. See, *e.g.*, 989 F. Supp. 2d, at 1274 (referring to Senator Dial's testimony that the Committee "could have used," but did not use, "white population within Jefferson County to repopu-

late the majority-black districts" because "doing so would have resulted in the retrogression of the majority-black districts and potentially created a problem for [Justice Department] preclearance"); *id.*, at 1276 (stating that Representative Jim McClendon, also committee cochair, "testified consistently with Senator Dial"); *id.*, at 1277 (noting that the committee's expert, Randolph Hinaman, testified that "he needed to add population" to majority-black districts "without significantly lowering the percentage of the population in each district that was majority-black").

The Caucus and the Conference presented much evidence at trial to show that that the legislature had deliberately moved black voters into these majority-minority districts—again, a specific set of districts—in order to prevent the percentage of minority voters in each district from declining. See, *e.g.*, Committee Guidelines 3–5; 1 Tr. 28–29, 36–37, 55, 63, 67–68, 77, 81, 96, 115, 124, 136, 138 (testimony of Senator Dial); Deposition of Gerald Dial in No. 12–cv–691 (May 21, 2013), Doc. 123–5, pp. 17, 39–41, 62, 100 (Dial Deposition); 3 Tr. 222 (testimony of Representative McClendon); *id.*, at 118–119, 145–146, 164, 182–183, 186–187 (testimony of Hinaman); Deposition of Randolph Hinaman in No. 12–cv–691 (June 25, 2013), Doc. 134–4, pp. 23–24, 101 (Hinaman Deposition).

In their post-trial Proposed Findings of Fact and Conclusions of Law, the plaintiffs stated that the evidence showed a racial gerrymander with respect to the majority of the majority-minority districts; they referred to the specific splitting of precinct and county lines in the drawing of many majority-minority districts; and they pointed to much district-specific evidence. *E.g.*, Alabama Legislative Black Caucus Plaintiffs' Notice of Filing Proposed Findings of Fact and Conclusions of Law in No. 12–cv–691, Doc. 194, pp. 9–10, 13–14, 30–35, 40 (Caucus Post-Trial Brief); Newton Plaintiffs' Notice of Filing Proposed

Findings of Fact and Conclusions of Law in No. 12–cv–691, Doc. 195, pp. 33–35, 56–61, 64–67, 69–74, 82–85, 108, 121–122 (Conference Post-Trial Brief); see also Appendix A, *infra* (organizing these citations by district).

We recognize that the plaintiffs relied heavily upon statewide evidence to prove that race predominated in the drawing of individual district lines. See generally Caucus Post-Trial Brief 1, 3–7, 48–50; Conference Post-Trial Brief 2, 44–45, 105–106. And they also sought to prove that the use of race to draw the boundaries of the majority-minority districts affected the boundaries of other districts as well. See, *e.g.*, 1 Tr. 36–37, 48, 55, 70–71, 93, 111, 124 (testimony of Dial); 3 Tr. 142, 162 (testimony of Hinaman); see generally Caucus Post-Trial Brief 8–16. Such evidence is perfectly relevant. We have said that the plaintiff's burden in a racial gerrymandering case is "to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U. S., at 916. Cf. *Easley* v. *Cromartie*, 532 U. S. 234, 258 (2001) (explaining the plaintiff's burden in cases, unlike these, in which the State argues that politics, not race, was its predominant motive). That Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote) provides evidence that race motivated the drawing of particular lines in multiple districts in the State. And neither the use of statewide evidence nor the effort to show widespread effect can transform a racial gerrymandering claim about a set of individual districts into a separate, general claim that the legislature racially gerrymandered the State "as" an undifferentiated "whole."

We, like the principal dissent, recognize that the plaintiffs could have presented their district-specific claims

more clearly, *post,* at 6–8, 10–12 (opinion of SCALIA, J.),
but the dissent properly concedes that its objection would
weaken had the Conference "developed such a claim in the
course of discovery and trial." *Post,* at 6. And that is just
what happened.

In the past few pages and in Appendix A, we set forth
the many record references that establish this fact. The
Caucus helps to explain the complaint omissions when it
tells us that the plaintiffs unearthed the factual basis for
their racial gerrymandering claims when they deposed the
committee's redistricting expert. See Brief for Appellants
in No. 13–895, pp. 12–13. The State neither disputes this
procedural history nor objects that plaintiffs' pleadings
failed to conform with the proof. Indeed, throughout, the
plaintiffs litigated these claims not as if they were wholly
separate entities but as if they were a team. See, *e.g.,*
Caucus Post-Trial Brief 1 ("[We] support the additional
claims made by the [Conference] plaintiffs"); but cf. *post*,
at 3–12 (SCALIA, J., dissenting) (treating separately Con-
ference claims from Caucus claims). Thus we, like the
dissenting judge below (who also lived with these cases
through trial), conclude that the record as a whole shows
that the plaintiffs brought, and their argument rested
significantly upon, district-specific claims. See 989
F. Supp. 2d, at 1313 (Thompson, J., dissenting) (constru-
ing plaintiffs as also challenging "each majority-Black
House and Senate District").

The principal dissent adds that the Conference waived
its district-specific claims on appeal. Cf. *post,* at 8. But
that is not so. When asked specifically about its position
at oral argument, the Conference stated that it was rely-
ing on statewide evidence to prove its district-specific
challenges. Tr. of Oral Arg. 15–16. Its counsel said that
"the exact same policy was applied in every black-majority
district," *id.,* at 15, and "[b]y statewide, we simply mean a
common policy applied to every district in the State," *id.,*

at 16. We accept the Conference's clarification, which is consistent with how it presented these claims below.

We consequently conclude that the District Court's analysis of racial gerrymandering of the State "as a whole" was legally erroneous. We find that the appellants did not waive their right to consideration of their claims as applied to particular districts. Accordingly, we remand the cases. See *Pullman-Standard* v. *Swint*, 456 U. S. 273, 291 (1982) (remand is required when the District Court "failed to make a finding because of an erroneous view of the law"); *Rapanos* v. *United States*, 547 U. S. 715, 757 (2006) (same).

## III

We next consider the District Court's holding with respect to standing. The District Court, *sua sponte*, held that the Conference lacked standing—either to bring racial gerrymandering claims with respect to the four individual districts that the court specifically considered (*i.e.*, Senate Districts 7, 11, 22, and 26) or to bring a racial gerrymandering claim with respect to the "State as a whole." 989 F. Supp. 2d, at 1292.

The District Court recognized that ordinarily

> "[a]n association has standing to bring suit on behalf of its members *when its members would have standing to sue in their own right*, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individuals members' participation in the lawsuit." *Id.*, at 1291 (quoting *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 181 (2000); emphasis added).

It also recognized that a "member" of an association "would have standing to sue" in his or her "own right" when that member "resides in the district that he alleges

was the product of a racial gerrymander." 989 F. Supp. 2d, at 1291 (citing *Hays*, 515 U. S., at 744–745). But, the District Court nonetheless denied standing because it believed that the "record" did "not clearly identify the districts in which the individual members of the [Conference] reside," and the Conference had "not proved that it has members who have standing to pursue any district-specific claims of racial gerrymandering." 989 F. Supp. 2d, at 1292.

The District Court conceded that Dr. Joe Reed, a representative of the Conference, testified that the Conference "has members in almost every county in Alabama." *Ibid.* But, the District Court went on to say that "the counties in Alabama are split into many districts." *Ibid.* And the "Conference offered no testimony or evidence that it has members in all of the districts in Alabama or in any of the [four] specific districts that it challenged." *Ibid.*

The record, however, lacks adequate support for the District Court's conclusion. Dr. Reed's testimony supports, and nothing in that record undermines, the Conference's own statement, in its post-trial brief, that it is a "statewide political caucus founded in 1960." Conference Post-Trial Brief 3. It has the "purpose" of "endors[ing] candidates for political office who will be responsible to the needs of the blacks and other minorities and poor people." *Id.,* at 3–4. These two statements (the second of which the principal dissent ignores), taken together with Dr. Reed's testimony, support an inference that the organization has members in all of the State's majority-minority districts, other things being equal, which is sufficient to meet the Conference's burden of establishing standing. That is to say, it seems highly likely that a "statewide" organization with members in "almost every county," the purpose of which is to help "blacks and other minorities and poor people," will have members in each majority-minority district. But cf. *post,* at 3–5 (SCALIA, J., dissenting).

At the very least, the common sense inference is strong enough to lead the Conference reasonably to believe that, in the absence of a state challenge or a court request for more detailed information, it need not provide additional information such as a specific membership list.  We have found nothing in the record, nor has the State referred us to anything in the record, that suggests the contrary.  Cf. App. 204–205, 208 (State arguing lack of standing, not because of inadequate member residency but because an association "lives" nowhere and that the Conference should join individual members).  The most the State argued was that "[n]one of the *individual* [p]laintiffs [who brought the case with the Conference] claims to live in" Senate District 11, *id.*, at 205 (emphasis added), but the Conference would likely not have understood that argument as a request that *it* provide a membership list.  In fact, the Conference might have understood the argument as an indication that the State did *not* contest its membership in every district.

To be sure, the District Court had an independent obligation to confirm its jurisdiction, even in the absence of a state challenge.  See *post,* at 4–5 (SCALIA, J., dissenting).  But, in these circumstances, elementary principles of procedural fairness required that the District Court, rather than acting *sua sponte*, give the Conference an opportunity to provide evidence of member residence.  Cf. *Warth* v. *Seldin*, 422 U. S. 490, 501–502 (1975) (explaining that a court may "allow or [r]equire" a plaintiff to supplement the record to show standing and that "[i]f, *after this opportunity*, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed" (emphasis added)).  Moreover, we have no reason to believe that the Conference would have been unable to provide a list of members, at least with respect to the majority-minority districts, had it been asked.  It has filed just such a list in this Court.  See Affidavit of Joe L. Reed

Pursuant to this Court's Rule 32.3 (Lodging of Conference affidavit listing members residing in each majority-minority district in the State); see also *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 718 (2007) (accepting a lodged affidavit in similar circumstances). Thus, the District Court on remand should reconsider the Conference's standing by permitting the Conference to file its list of members and permitting the State to respond, as appropriate.

## IV

The District Court held in the alternative that the claims of racial gerrymandering must fail because "[r]ace was not the predominant motivating factor" in the creation of any of the challenged districts. 989 F. Supp. 2d, at 1293. In our view, however, the District Court did not properly calculate "predominance." In particular, it judged race to lack "predominance" in part because it placed in the balance, among other nonracial factors, legislative efforts to create districts of approximately equal population. See, *e.g.*, *id.*, at 1305 (the "need to bring the neighboring districts into compliance with the requirement of one person, one vote *served as the primary motivating factor* for the changes to [Senate] District 22" (emphasis added)); *id.*, at 1297 (the "constitutional requirement of one person, one vote trumped every other districting principle"); *id.*, at 1296 (the "record establishes that the drafters of the new districts, above all, had to correct [for] severe malapportionment . . ."); *id.*, at 1306 (the "inclusion of additional precincts [in Senate District 26] is a reasonable response to the underpopulation of the District").

In our view, however, an equal population goal is not one factor among others to be weighed against the use of race to determine whether race "predominates." Rather, it is part of the redistricting background, taken as a given,

when determining whether race, or other factors, predominate in a legislator's determination as to *how* equal population objectives will be met.

To understand this conclusion, recall what "predominance" is about: A plaintiff pursuing a racial gerrymandering claim must show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U. S., at 916. To do so, the "plaintiff must prove that the legislature subordinated *traditional race-neutral districting principles* . . . to racial considerations." *Ibid.* (emphasis added).

Now consider the nature of those offsetting "traditional race-neutral districting principles." We have listed several, including "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests," *ibid.*, incumbency protection, and political affiliation, *Vera*, 517 U. S., at 964, 968 (principal opinion).

But we have not listed equal population objectives. And there is a reason for that omission. The reason that equal population objectives do not appear on this list of "traditional" criteria is that equal population objectives play a different role in a State's redistricting process. That role is not a minor one. Indeed, in light of the Constitution's demands, that role may often prove "predominant" in the ordinary sense of that word. But, as the United States points out, "predominance" in the context of a racial gerrymandering claim is special. It is not about whether a legislature believes that the need for equal population takes ultimate priority. Rather, it is, as we said, whether the legislature "placed" race "above traditional districting considerations in determining *which* persons were placed *in appropriately apportioned districts.*" Brief for United States as *Amicus Curiae* 19 (some emphasis added). In other words, if the legislature must place 1,000 or so additional voters in a particular district

in order to achieve an equal population goal, the "predominance" question concerns *which* voters the legislature decides to choose, and specifically whether the legislature predominately uses race as opposed to other, "traditional" factors when doing so.

Consequently, we agree with the United States that the requirement that districts have approximately equal populations is a background rule against which redistricting takes place. *Id.*, at 12. It is not a factor to be treated like other nonracial factors when a court determines whether race predominated over other, "traditional" factors in the drawing of district boundaries.

Had the District Court not taken a contrary view of the law, its "predominance" conclusions, including those concerning the four districts that the Conference specifically challenged, might well have been different. For example, once the legislature's "equal population" objectives are put to the side—*i.e.*, seen as a background principle—then there is strong, perhaps overwhelming, evidence that race did predominate as a factor when the legislature drew the boundaries of Senate District 26, the one district that the parties have discussed here in depth.

The legislators in charge of creating the redistricting plan believed, and told their technical adviser, that a primary redistricting goal was to maintain existing racial percentages in each majority-minority district, insofar as feasible. See *supra*, at 9–10 (compiling extensive record testimony in support of this point). There is considerable evidence that this goal had a direct and significant impact on the drawing of at least some of District 26's boundaries. See 3 Tr. 175–180 (testimony of Hinaman); Appendix C, *infra* (change of district's shape from rectangular to irregular). Of the 15,785 individuals that the new redistricting laws added to the population of District 26, just 36 were white—a remarkable feat given the local demographics. See, *e.g.,* 2 Tr. 127–128 (testimony of Senator Quinton

Ross); 3 Tr. 179 (testimony of Hinaman).  Transgressing their own redistricting guidelines, Committee Guidelines 3–4, the drafters split seven precincts between the majority-black District 26 and the majority-white District 25, with the population in those precincts clearly divided on racial lines.  See Exh. V in Support of Newton Plaintiffs' Opposition to Summary Judgment in No. 12–cv–691, Doc. 140–1, pp. 91–95.  And the District Court conceded that race "was a factor in the drawing of District 26," and that the legislature "preserved" "the percentage of the population that was black."  989 F. Supp. 2d, at 1306.

We recognize that the District Court also found, with respect to District 26, that "preservi[ng] the core of the existing [d]istrict," following "county lines," and following "highway lines" played an important boundary-drawing role.  *Ibid*.  But the first of these (core preservation) is not directly relevant to the origin of the *new* district inhabitants; the second (county lines) seems of marginal importance since virtually all Senate District 26 boundaries departed from county lines; and the third (highways) was not mentioned in the legislative redistricting guidelines. Cf. Committee Guidelines 3–5.

All this is to say that, with respect to District 26 and likely others as well, had the District Court treated equal population goals as background factors, it might have concluded that race was the predominant boundary-drawing consideration.  Thus, on remand, the District Court should reconsider its "no predominance" conclusions with respect to Senate District 26 and others to which our analysis is applicable.

Finally, we note that our discussion in this section is limited to correcting the District Court's misapplication of the "predominance" test for strict scrutiny discussed in *Miller*, 515 U. S., at 916.  It does not express a view on the question of whether the intentional use of race in redistricting, even in the absence of proof that traditional

districting principles were subordinated to race, triggers strict scrutiny. See *Vera*, 517 U. S., at 996 (KENNEDY, J., concurring).

V

The District Court, in a yet further alternative holding, found that "[e]ven if the [State] subordinated traditional districting principles to racial considerations," the racial gerrymandering claims failed because, in any event, "the Districts would satisfy strict scrutiny." 989 F. Supp. 2d, at 1306. In the District Court's view, the "Acts are narrowly tailored to comply with Section 5" of the Voting Rights Act. *Id.*, at 1311. That provision "required the Legislature to maintain, where feasible, the existing number of majority-black districts and *not substantially reduce the relative percentages of black voters in those districts.*" *Ibid.* (emphasis added). And, insofar as the State's redistricting embodied racial considerations, it did so in order to meet this §5 requirement.

In our view, however, this alternative holding rests upon a misperception of the law. Section 5, which covered particular States and certain other jurisdictions, does not require a covered jurisdiction to maintain a particular numerical minority percentage. It requires the jurisdiction to maintain a minority's ability to elect a preferred candidate of choice. That is precisely what the language of the statute says. It prohibits a covered jurisdiction from adopting any change that "has the purpose of or will have the effect of diminishing the ability of [the minority group] to elect their preferred candidates of choice." 52 U. S. C. §10304(b); see also §10304(d) (the "purpose of subsection (b) . . . is to protect the ability of such citizens to elect their preferred candidates of choice").

That is also just what Department of Justice Guidelines say. The Guidelines state specifically that the Department's preclearance determinations are not based

"on any predetermined or fixed demographic percent-
ages. . . .   Rather, in the Department's view, this de-
termination requires a functional analysis of the elec-
toral behavior within the particular jurisdiction or
election district. . . . [C]ensus data alone may not pro-
vide sufficient indicia of electoral behavior to make
the requisite determination."   Guidance Concerning
Redistricting Under Section 5 of the Voting Rights
Act, 76 Fed. Reg. 7471 (2011).

Consistent with this view, the United States tells us that
"Section 5" does not "requir[e] the State to maintain the
same percentage of black voters in each of the majority-
black districts as had existed in the prior districting
plans."   Brief for United States as *Amicus Curiae* 22.
Rather, it "prohibits only those diminutions of a minority
group's proportionate strength that strip the group within
a district of its existing ability to elect its candidates of
choice."   *Id.*, at 22–23.   We agree.   Section 5 does not re-
quire maintaining the same population percentages in
majority-minority districts as in the prior plan.   Rather, §5
is satisfied if minority voters retain the ability to elect
their preferred candidates.

    The history of §5 further supports this view.   In adopt-
ing the statutory language to which we referred above,
Congress rejected this Court's decision in *Georgia* v. *Ash-
croft*, 539 U. S. 461, 480 (2003) (holding that it is not nec-
essarily retrogressive for a State to replace safe majority-
minority districts with crossover or influence districts),
and it adopted the views of the dissent.   H. R. Rep. No.
109–478, pp. 68–69, and n. 183 (2006).   While the thrust of
Justice Souter's dissent was that, in a §5 retrogression
case, courts should ask whether a new voting provision
would likely deprive minority voters of their ability to
elect a candidate of their choice—language that Congress
adopted in revising §5—his dissent also made clear that

courts should not mechanically rely upon numerical percentages but should take account of all significant circumstances. *Georgia* v. *Ashcroft*, *supra*, at 493, 498, 505, 509. And while the revised language of §5 may raise some interpretive questions—*e.g.*, its application to coalition, crossover, and influence districts—it is clear that Congress did not mandate that a 1% reduction in a 70% black population district would be necessarily retrogressive. See Persily, The Promises and Pitfalls of the New Voting Rights Act, 117 Yale L. J. 174, 218 (2007). Indeed, Alabama's mechanical interpretation of §5 can raise serious constitutional concerns. See *Miller*, *supra*, at 926.

The record makes clear that both the District Court and the legislature relied heavily upon a mechanically numerical view as to what counts as forbidden retrogression. See Appendix B, *infra*. And the difference between that view and the more purpose-oriented view reflected in the statute's language can matter. Imagine a majority-minority district with a 70% black population. Assume also that voting in that district, like that in the State itself, is racially polarized. And assume that the district has long elected to office black voters' preferred candidate. Other things being equal, it would seem highly unlikely that a redistricting plan that, while increasing the numerical size of the district, reduced the percentage of the black population from, say, 70% to 65% would have a significant impact on the black voters' ability to elect their preferred candidate. And, for that reason, it would be difficult to explain just why a plan that uses racial criteria predominately to maintain the black population at 70% is "narrowly tailored" to achieve a "compelling state interest," namely the interest in preventing §5 retrogression. The circumstances of this hypothetical example, we add, are close to those characterizing Senate District 26, as set forth in the District Court's opinion and throughout the record. See, *e.g.*, 1 Tr. 131–132 (testimony of Dial); 3 Tr.

180 (testimony of Hinaman).

In saying this, we do not insist that a legislature guess precisely what percentage reduction a court or the Justice Department might eventually find to be retrogressive. The law cannot insist that a state legislature, when redistricting, determine *precisely* what percent minority population §5 demands. The standards of §5 are complex; they often require evaluation of controverted claims about voting behavior; the evidence may be unclear; and, with respect to any particular district, judges may disagree about the proper outcome. The law cannot lay a trap for an unwary legislature, condemning its redistricting plan as either (1) unconstitutional racial gerrymandering should the legislature place a few too many minority voters in a district or (2) retrogressive under §5 should the legislature place a few too few. See *Vera*, 517 U. S., at 977 (principal opinion). Thus, we agree with the United States that a court's analysis of the narrow tailoring requirement insists only that the legislature have a "strong basis in evidence" in support of the (race-based) choice that it has made. Brief for United States as *Amicus Curiae* 29 (citing *Ricci* v. *DeStefano*, 557 U. S. 557, 585 (2009)). This standard, as the United States points out, "does not demand that a State's actions actually be necessary to achieve a compelling state interest in order to be constitutionally valid." Brief for United States as *Amicus Curiae* 29. And legislators "may have a strong basis in evidence to use racial classifications in order to comply with a statute when they have *good reasons* to believe such use is required, even if a court does not find that the actions were necessary for statutory compliance." *Ibid.* (emphasis added).

Here the District Court enunciated a narrow tailoring standard close to the one we have just mentioned. It said that a plan is "narrowly tailored . . . when the race-based action taken was *reasonably necessary*" to achieve a compelling interest. 989 F. Supp. 2d, at 1307 (emphasis added).

And it held that preventing retrogression is a compelling interest. *Id.*, at 1306–1307. While we do not here decide whether, given *Shelby County* v. *Holder*, 570 U. S. ___ (2013), continued compliance with §5 remains a compelling interest, we conclude that the District Court and the legislature asked the wrong question with respect to narrow tailoring. They asked: "How can we maintain present minority percentages in majority-minority districts?" But given §5's language, its purpose, the Justice Department Guidelines, and the relevant precedent, they should have asked: "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice?" Asking the wrong question may well have led to the wrong answer. Hence, we cannot accept the District Court's "compelling interest/narrow tailoring" conclusion.

\* \* \*

For these reasons, the judgment of the District Court is vacated. We note that appellants have also raised additional questions in their jurisdictional statements, relating to their one-person, one-vote claims (Caucus) and vote dilution claims (Conference), which were also rejected by the District Court. We do not pass upon these claims. The District Court remains free to reconsider the claims should it find reconsideration appropriate. And the parties are free to raise them, including as modified by the District Court, on any further appeal.

The cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Appendixes
A

| Majority-minority District | Instances in Plaintiffs' Post-Trial Briefs Arguing that Traditional Race-Neutral Districting Principles Were Subordinated to Race |
|---|---|
| HOUSE | |
| HD 52, 54–60 | Caucus Post-Trial Brief 30; Conference Post-Trial Brief 56–57, 60, 82–83, 121–122 |
| HD 53 | Caucus Post-Trial Brief 33–35; Conference Post-Trial Brief 59–61 |
| HD 68 | Conference Post-Trial Brief 70, 84–85 |
| HD 69 | Conference Post-Trial Brief 66–67, 85 |
| HD 70 | Conference Post-Trial Brief 85 |
| HD 71 | Conference Post-Trial Brief 83–85 |
| HD 72 | Caucus Post-Trial Brief 40; Conference Post-Trial Brief 83–85 |
| HD 76–78 | Conference Post-Trial Brief 65–66 |
| SENATE* | |
| SD 18–20 | Conference Post-Trial Brief 56–59 |
| SD 23–24 | Caucus Post-Trial Brief 9–10, 40; Conference Post-Trial Brief 69–74 |
| SD 33 | Caucus Post-Trial Brief 13–14 |

* Senate District 26 excluded from this list

B

State's Use of Incorrect Retrogression Standard

The following citations reflect instances in either the District Court opinion or in the record showing that the State believed that §5 forbids, not just *substantial* reductions, but *any* reduction in the percentage of black inhabitants of a majority-minority district.

| **District Court Findings** | 989 F. Supp. 2d, at 1307; *id.*, at 1273; *id.*, at 1247 | |
|---|---|---|
| **Evidence in the Record** | Senator Gerald Dial | 1 Tr. 28–29, 36–37, 55, 81, 96, 136, 138 |
| | | Dial Deposition 17, 39–41, 81, 100 |
| | Representative Jim McClendon | 3 Tr. 222 |
| | Randolph Hinaman | 3 Tr. 118–119, 145–146, 149–150, 164, 182–183, 187 |
| | | Hinaman Deposition 23–24, 101; but see *id.*, at 24–25, 101 |

Appendix C to opinion of the Court

C



# SUPREME COURT OF THE UNITED STATES

_____

Nos. 13–895 and 13–1138

_____

ALABAMA LEGISLATIVE BLACK CAUCUS, ET AL.,
APPELLANTS

13–895                          *v.*

ALABAMA ET AL.


ALABAMA DEMOCRATIC CONFERENCE, ET AL.,
APPELLANTS

13–1138                         *v.*

ALABAMA ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA

[March 25, 2015]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO join, dissenting.

Today, the Court issues a sweeping holding that will have profound implications for the constitutional ideal of one person, one vote, for the future of the Voting Rights Act of 1965, and for the primacy of the State in managing its own elections. If the Court's destination seems fantastical, just wait until you see the journey.

Two groups of plaintiffs, the Alabama Democratic Conference and the Alabama Legislative Black Caucus, brought separate challenges to the way in which Alabama drew its state legislative districts following the 2010 census. These cases were consolidated before a three-judge District Court. Even after a full trial, the District Court lamented that "[t]he filings and arguments made by the plaintiffs on these claims were mystifying at best." 989 F. Supp. 2d 1227, 1287 (MD Ala. 2013). Nevertheless, the

District Court understood both groups of plaintiffs to argue, as relevant here, only that "the Acts as a whole constitute racial gerrymanders." *Id.,* at 1287. It also understood the Democratic Conference to argue that "Senate Districts 7, 11, 22, and 26 constitute racial gerrymanders," *id.,* at 1288, but held that the Democratic Conference lacked standing to bring "*any* district-specific claims of racial gerrymandering," *id.,* at 1292 (emphasis added). It then found for Alabama on the merits.

The Court rightly concludes that our racial gerrymandering jurisprudence does not allow for statewide claims. *Ante*, at 5–12. However, rather than holding appellants to the misguided legal theory they presented to the District Court, it allows them to take a mulligan, remanding the case with orders that the District Court consider whether some (all?) of Alabama's 35 majority-minority districts result from impermissible racial gerrymandering. In doing this, the Court disregards the detailed findings and thoroughly reasoned conclusions of the District Court—in particular its determination, reached after watching the development of the case from complaint to trial, that no appellant proved (or even pleaded) district-specific claims with respect to the majority-minority districts. Worse still, the Court ignores the Democratic Conference's express waiver of these claims before this Court. It does this on the basis of a few stray comments, cherry-picked from district-court filings that are more Rorschach brief than Brandeis brief, in which the vague outline of what could be district-specific racial-gerrymandering claims begins to take shape only with the careful, post-hoc nudging of appellate counsel.

Racial gerrymandering strikes at the heart of our democratic process, undermining the electorate's confidence in its government as representative of a cohesive body politic in which all citizens are equal before the law. It is therefore understandable, if not excusable, that the Court balks

at denying merits review simply because appellants pursued a flawed litigation strategy. But allowing appellants a second bite at the apple invites lower courts similarly to depart from the premise that ours is an adversarial system whenever they deem the stakes sufficiently high. Because I do not believe that Article III empowers this Court to act as standby counsel for sympathetic litigants, I dissent.

## I. The Alabama Democratic Conference

The District Court concluded that the Democratic Conference lacked standing to bring district-specific claims. It did so on the basis of the Conference's failure to present any evidence that it had members who voted in the challenged districts, and because the individual Conference plaintiffs did not claim to vote in them. 989 F. Supp. 2d, at 1292.

A voter has standing to bring a racial-gerrymandering claim only if he votes in a gerrymandered district, or if specific evidence demonstrates that he has suffered the special harms that attend racial gerrymandering. *United States* v. *Hays*, 515 U. S. 737, 744–745 (1995). However, the Democratic Conference only claimed to have "chapters and members in *almost* all counties in the state." Newton Plaintiffs' Proposed Findings of Fact and Conclusions of Law in No. 12–cv–691, Doc. 195–1, pp. 3–4 (Democratic Conference Post-Trial Brief) (emphasis added). Yet the Court concludes that this fact, combined with the Conference's self-description as a "'statewide political caucus'" that endorses candidates for political office, "supports an inference that the organization has members in all of the State's majority-minority districts, other things being equal." *Ante,* at 13. The Court provides no support for this theory of jurisdiction by illogical inference, perhaps because this Court has rejected other attempts to peddle more-likely-than-not standing. See *Summers* v. *Earth*

*Island Institute,* 555 U. S. 488, 497 (2009) (rejecting a test for organizational standing that asks "whether, accepting [an] organization's self-description of the activities of its members, there is a statistical probability that some of those members are threatened with concrete injury").

The inference to be drawn from the Conference's statements cuts in precisely the opposite direction. What is at issue here is not just counties but voting districts within counties. If the Conference has members in *almost* every county, then there must be counties in which it does not have members; and we have no basis for concluding (or inferring) that those counties do not contain all of the majority-minority voting districts. Morever, even in those counties in which the Conference does have members, we have no basis for concluding (or inferring) that those members vote in majority-minority districts. The Conference had plenty of opportunities, including at trial, to demonstrate that this was the case, and failed to do so. This failure lies with the Democratic Conference, and the consequences should be borne by it, not by the people of Alabama, who must now shoulder the expense of further litigation and the uncertainty that attends a resuscitated constitutional challenge to their legislative districts.

Incredibly, the Court thinks that "elementary principles of procedural fairness" *require* giving the Democratic Conference the opportunity to prove on appeal what it neglected to prove at trial. *Ante,* at 14. It observes that the Conference had no reason to believe it should provide such information because "the State did *not* contest its membership in every district," and the opinion cites an affidavit lodged *with this Court* providing a list of the Conference's members in each majority-minority district in Alabama. *Ibid.* I cannot imagine why the absence of a state challenge would matter. Whether or not there was such a challenge, it was the Conference's responsibility, as "[t]he party invoking federal jurisdiction," to establish

standing. See *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 561 (1992). That responsibility was enforceable, challenge or no, by the court: "The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *FW/PBS, Inc.* v. *Dallas*, 493 U. S. 215, 230–231 (1990) (citations omitted). And because standing is not a "mere pleading requiremen[t] but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Defenders of Wildlife, supra*, at 561.

The Court points to *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 718 (2007), as support for its decision to sandbag Alabama with the Democratic Conference's out-of-time (indeed, out-of-court) lodging in this Court. The circumstances in that case, however, are far afield. The organization of parents in that case had established organizational standing in the lower court by showing that it had members with children who would be subject to the school district's "integration tiebreaker," which was applied at ninth grade. Brief for Respondents, O. T. 2006, No. 05–908, p. 16. By the time the case reached this Court, however, the youngest of these children had entered high school, and so would no longer be subject to the challenged policy. *Ibid.* Accordingly, we accepted a lodging that provided names of additional, younger children in order to show that the organization had not *lost* standing as a result of the long delay that often accompanies federal litigation. Here, by contrast, the Democratic Conference's lodging in the Supreme Court is its first attempt to show that it has members in the majority-minority districts. This is too little, too late.

But that is just the start. Even if the Democratic Con-

ference *had standing to bring* district-specific racial-gerrymandering claims, there remains the question whether it *did* bring them. Its complaint alleged three counts: (1) Violation of §2 of the Voting Rights Act, (2) Racial gerrymandering in violation of the Equal Protection Clause, and (3) §1983 violations of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. Complaint in No. 2:12–cv–1081, Doc. 1, pp. 17–18. The racial gerrymandering count alleged that "Alabama Acts 2012-602 and 2012-603 were drawn for the purpose and effect of minimizing the opportunity of minority voters to participate effectively in the political process," and that this "racial gerrymandering by Alabama Acts 2012-602 and 2012-603 violates the rights of Plaintiffs." *Id.,* at 17. It made no reference to specific districts that were racially gerrymandered; indeed, the only particular jurisdictions mentioned *anywhere* in the complaint were Senate District 11, Senate District 22, Madison County Senate Districts, House District 73, and Jefferson and Montgomery County House Districts. None of the Senate Districts is majority-minority. Nor is House District 73. Jefferson County does, admittedly, contain 8 of the 27 majority-minority House Districts in Alabama, and Montgomery County contains another 4, making a total of 12. But they also contain 14 majority-white House Districts between them. In light of this, it is difficult to understand the Court's statement that appellants' "evidence and . . . arguments embody the claim that individual majority-minority districts were racially gerrymandered." *Ante,* at 8.

That observation would, of course, make sense if the Democratic Conference had developed such a claim in the course of discovery and trial. But in its post-trial Proposed Findings of Fact and Conclusions of Law, the Conference hewed to its original charge of statewide racial gerrymandering—or, rather, it did so as much as it reasonably could without actually proposing that the Court

find *any* racial gerrymandering, statewide or otherwise. Instead, the Conference chose only to pursue claims that Alabama violated §2 of the Voting Rights Act under two theories. See Democratic Conference Post-Trial Brief 91–103 (alleging a violation of the results prong of Voting Rights Act §2) and 103–124 (alleging a violation of the purpose prong of Voting Rights Act §2).

To be sure, the Conference employed language and presented factual claims at various points in its 126-page post-trial brief that are evocative of a claim of racial gerrymandering. But in clinging to these stray comments to support its conclusion that the Conference made district-specific racial-gerrymandering claims, *ante,* at 9–10, the Court ignores the context in which these comments appear—the context of a clear Voting Rights Act §2 claim. Voting Rights Act claims and racial-gerrymandering claims share some of the same elements. See *League of United Latin American Citizens* v. *Perry,* 548 U. S. 399, 514 (2006) (SCALIA, J., concurring in judgment in part and dissenting in part). Thus, allegations made in the course of arguing a §2 claim will often be indistinguishable from allegations that would be made in support of a racial-gerrymandering claim. The appearance of such allegations in one of the Conference's briefs might support reversal if this case came to us on appeal from the District Court's grant of a motion to dismiss. See *Johnson* v. *City of Shelby*, 574 U. S. \_\_\_, \_\_\_ (2014) (*per curiam*) (slip op., at 1) (noting that the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"). But here the District Court held a full trial before concluding that the Conference failed to make or prove any district-specific racial-gerrymandering claims with respect to the majority-minority districts. In this posture, and on this record, I cannot agree with the Court that the Conference's district-specific evidence, clearly made in the

course of arguing a §2 theory, should be read to give rise to district-specific claims of racial gerrymandering with respect to Alabama's majority-minority districts.

The Court attempts to shift responsibility for the Democratic Conference's ill-fated statewide theory from the Conference to the District Court, implying that it was the "legally erroneous" analysis of the District Court, *ante,* at 12, rather than the arguments made by the Conference, that conjured this "legal unicorn," *ante,* at 7, so that the Conference did not forfeit the claims that the Court now attributes to it, *ante,* at 12. I suspect this will come as a great surprise to the Conference. Whatever may have been presented to the District Court, the Conference unequivocally stated in its opening brief: "Appellants challenge Alabama's race-based statewide redistricting policy, *not* the design of any one particular election district." Brief for Appellants in No. 13–1138, p. 2 (emphasis added). It drove the point home in its reply brief: "[I]f the Court were to apply a predominant-motive and narrow-tailoring analysis, that analysis should be applied to the state's *policy*, not to the design of each particular district one-by-one." Reply Brief in No. 11–1138, p. 7. How could anything be clearer? As the Court observes, the Conference attempted to walk back this unqualified description of its case at oral argument. *Ante*, at 11–12. Its assertion that what it *really* meant to challenge was the policy as applied to every district (*not* every majority-minority district, mind you) is not "clarification," *ante*, at 12, but an entirely new argument—indeed, the same argument it expressly disclaimed in its briefing. "We will not revive a forfeited argument simply because the petitioner gestures toward it in its reply brief." *Republic of Argentina* v. *NML Capital, Ltd.*, 573 U. S. ___, ___, n. 2 (2014) (slip op., at 5, n. 2); we certainly should not do so when the issue is first presented at oral argument.

## II. The Alabama Legislative Black Caucus

The Court does not bother to disentangle the independent claims brought by the Black Caucus from those of the Democratic Conference, but it strongly implies that both parties asserted racial-gerrymandering claims with respect to Alabama's 35 majority-minority districts. As we have described, the Democratic Conference brought no such claims; and the Black Caucus's filings provide even weaker support for the Court's conclusion.

The Black Caucus complaint contained three counts: (1) Violation of One Person, One Vote, see *Reynolds* v. *Sims*, 377 U. S. 533 (1964); (2) Dilution and Isolation of Black Voting Strength in violation of §2 of the Voting Rights Act; and (3) Partisan Gerrymandering. Complaint in No. 2:12–cv–691, Doc. 1, pp. 15–22. The failure to raise *any* racial-gerrymandering claim was not a mere oversight or the consequence of inartful pleading. Indeed, in its amended complaint the Black Caucus specifically cited this Court's leading racial-gerrymandering case for the proposition that "traditional or neutral districting principles may not be subordinated in a dominant fashion by *either racial or partisan interests* absent a compelling state interest for doing so." Amended Complaint in No. 2:12–cv–691, Doc. 60, p. 23 (citing *Shaw* v. *Reno*, 509 U. S. 630, 642 (1993); emphasis added). This quote appears in the first paragraph under the "Partisan Gerrymandering" heading, and claims of subordination to *racial* interests are notably absent from the Black Caucus complaint.

Racial gerrymandering was not completely ignored, however. In a brief introductory paragraph to the amended complaint, before addressing jurisdiction and venue, the Black Caucus alleged that "Acts 2012-602 and 2012-603 are racial gerrymanders that unnecessarily minimize population deviations and violate the whole-county provisions of the Alabama Constitution with both the purpose and effect of minimizing black voting strength and isolat-

ing from influence in the Alabama Legislature legislators chosen by African Americans." Amended Complaint, at 3. This was the first and last mention of racial gerrymandering, and like the Democratic Conference's complaint, it focused exclusively on the districting maps as a whole rather than individual districts. Moreover, even this allegation appears primarily concerned with the use of racially motivated districting as a means of violating one person, one vote (by splitting counties), and §2 of the Voting Rights Act (by minimizing and isolating black voters and legislators).

To the extent the Black Caucus cited particular districts in the body of its complaint, it did so only with respect to its enumerated one-person, one-vote, Voting Rights Act, and partisan-gerrymandering counts. See, *e.g., id.,* at 13–14 (alleging that the "deviation restriction and disregard of the 'whole county' requirements . . . facilitated the Republican majority's efforts to gerrymander the district boundaries in Acts 2012–602 and 2012–603 for partisan purposes. By packing the majority-black House and Senate districts, the plans remove reliable Democratic voters from adjacent majority-white districts . . ."); *id.*, at 36 ("The partisan purpose of [one] gerrymander was to remove predominately black Madison County precincts to SD 1, avoiding a potential crossover district"); *id.*, at 44–45 (asserting that "splitting Jefferson County among 11 House and Senate districts" and "increasing the size of its local legislative delegation and the number of other counties whose residents elect members" of the delegation "dilut[es] the votes of Jefferson County residents" by diminishing their ability to control county-level legislation in the state legislature). And even these claims were made with a statewide scope in mind. *Id.*, at 55 ("Viewed in their entirety, the plans in Acts 2012-602 and 2012-603 have the purpose and effect of minimizing the opportunities for black and white voters who support the Democratic

Party to elect candidates of their choice").

Here again, discovery and trial failed to produce any clear claims with respect to the majority-minority districts. In a curious inversion of the Democratic Conference's practice of pleading racial gerrymandering and then effectively abandoning the claims, the Black Caucus, which failed to plead racial gerrymandering, did clearly advance the theory after the trial. See Alabama Legislative Black Caucus Plaintiffs' Post-Trial Proposed Findings of Fact and Conclusions of Law in No. 2:12–cv–691, Doc. 194, pp. 48–51 (Black Caucus Post-Trial Brief). The Black Caucus asserted racial-gerrymandering claims in its post-trial brief, but they all had a clear statewide scope. It charged that Alabama "started their line drawing with the majority-black districts" so as to maximize the size of their black majorities, which "impacted the drawing of majority-white districts in nearly every part of the state." *Id.,* at 48–49. "[R]ace was the predominant factor in drafting both plans," *id.,* at 49, which "drove nearly every districting decision," "dilut[ing] the influence of black voters in the majority-white districts," *id.,* at 50.

The Black Caucus did present district-specific evidence in the course of developing its other legal theories. Although this included evidence that Alabama manipulated the racial composition of certain majority-minority districts, it also included evidence that Alabama manipulated racial distributions with respect to the districting maps as a whole, *id.,* at 6 ("Maintaining the same high black percentages had a predominant impact on the entire plan"), and with respect to majority-white districts, *id.,* at 10–11 ("Asked why [majority-white] SD 11 was drawn in a semi-donut-shape that splits St. Clair, Talladega, and Shelby Counties, Sen. Dial blamed that also on the need to preserve the black majorities in Jefferson County Senate districts"), and 43–44 ("Sen. Irons' quick, 'primative' [*sic*] analysis of the new [majority-white] SD 1 convinced her

that it was designed to 'shed' the minority population of Sen. Sanford's [majority-white] SD 7 to SD 1" in order to "crack a minority influence district"). The Black Caucus was attacking the legislative districts from every angle. Nothing gives rise to an inference that it ever homed in on majority-minority districts—or, for that matter, any particular set of districts. Indeed, the fair reading of the Black Caucus's filings is that it was presenting illustrative evidence in particular districts—majority-minority, minority-influence, and majority-white—in an effort to make out a claim of statewide racial gerrymandering. The fact that the Court now concludes that this is not a valid legal theory does not justify its repackaging the claims for a second round of litigation.

## III. Conclusion

Frankly, I do not know what to make of appellants' arguments. They are pleaded with such opacity that, squinting hard enough, one can find them to contain just about anything. This, the Court believes, justifies demanding that the District Court go back and squint harder, so that it may divine some new means of construing the filings. This disposition is based, it seems, on the implicit premise that plaintiffs only plead legally correct theories. That is a silly premise. We should not reward the practice of litigation by obfuscation, especially when we are dealing with a well-established legal claim that numerous plaintiffs have successfully brought in the past. See, *e.g.,* Amended Complaint and Motion for Preliminary and Permanent Injunction in *Cromartie* v. *Hunt*, No. 4:96–cv–104 (EDNC), Doc. 21, p. 9 ("Under the March 1997 redistricting plan, the Twelfth District and First District have boundaries which were drawn pursuant to a predominantly racial motivation," which were "the fruit of [earlier] racially gerrymandered plans"). Even the complaint in *Shaw*, which established a cause of action for racial ger-

rymandering, displayed greater lucidity than appellants', alleging that defendants "creat[ed] two amorphous districts which embody a scheme for segregation of voters by race in order to meet a racial quota" "totally unrelated to considerations of compactness, contiguous, and geographic or jurisdictional communities of interest." Complaint and Motion for Preliminary and Permanent Injunction and for Temporary Restraining Order in *Shaw* v. *Barr*, No. 5:92–cv–202 (EDNC), Doc. 1, pp. 11–12.

The Court seems to acknowledge that appellants never focused their racial-gerrymandering claims on Alabama's majority-minority districts. While remanding to consider whether the majority-minority districts were racially gerrymandered, it admits that plaintiffs "basically claim that the State, in adding so many new minority voters to majority-minority districts (*and to others*), went too far." *Ante,* at 3 (emphasis added). It further concedes that appellants "relied heavily upon statewide evidence," and that they "also sought to prove that the use of race to draw the boundaries of the majority-minority districts affected the boundaries of other districts as well." *Ante,* at 10.

The only reason I see for the Court's selection of the majority-minority districts as the relevant set of districts for the District Court to consider on remand is that this was the set chosen by appellants after losing on the claim they actually presented in the District Court. By playing along with appellants' choose-your-own-adventure style of litigation, willingly turning back the page every time a strategic decision leads to a dead-end, the Court discourages careful litigation and punishes defendants who are denied both notice and repose. The consequences of this unprincipled decision will reverberate far beyond the narrow circumstances presented in this case.

Accordingly, I dissent.

# SUPREME COURT OF THE UNITED STATES

―――――――

Nos. 13–895 and 13–1138

―――――――

ALABAMA LEGISLATIVE BLACK CAUCUS, ET AL.,
APPELLANTS

13–895                          *v.*
ALABAMA ET AL.

ALABAMA DEMOCRATIC CONFERENCE, ET AL.,
APPELLANTS

13–1138                         *v.*
ALABAMA ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA

[March 25, 2015]

JUSTICE THOMAS, dissenting.

"[F]ew devices could be better designed to exacerbate racial tensions than the consciously segregated districting system currently being constructed in the name of the Voting Rights Act." *Holder* v. *Hall*, 512 U. S. 874, 907 (1994) (THOMAS, J., concurring in judgment). These consolidated cases are yet another installment in the "disastrous misadventure" of this Court's voting rights jurisprudence. *Id.,* at 893. We have somehow arrived at a place where the parties agree that Alabama's legislative districts should be fine-tuned to achieve some "optimal" result with respect to black voting power; the only disagreement is about what *percentage* of blacks should be placed in those optimized districts. This is nothing more than a fight over the "best" racial quota.

I join JUSTICE SCALIA's dissent. I write only to point out that, as this case painfully illustrates, our jurisprudence

in this area continues to be infected with error.

## I

The Alabama Legislature faced a difficult situation in its 2010 redistricting efforts. It began with racially segregated district maps that were inherited from previous decades. The maps produced by the 2001 redistricting contained 27 majority-black House districts and 8 majority-black Senate districts—both at the time they were drawn, App. to Juris. Statement 47–48, and at the time of the 2010 Census, App. 103–108. Many of these majority-black districts were over 70% black when they were drawn in 2001, and even more were over 60% black. App. to Juris. Statement 47–48. Even after the 2010 Census, the population remained above 60% black in the majority of districts. App. 103–108.

Under the 2006 amendments to §5 of the Voting Rights Act of 1965, Alabama was also under a federal command to avoid drawing new districts that would "have the effect of diminishing the ability" of black voters "to elect their preferred candidates of choice." 52 U. S. C. §10304(b). To comply with §5, the legislature adopted a policy of maintaining the same percentage of black voters within each of those districts as existed in the 2001 plans. See *ante,* at 16. This, the districting committee thought, would preserve the ability of black voters to elect the same number of preferred candidates. App. to Juris. Statement 174–175. The Department of Justice (DOJ) apparently agreed. Acting under its authority to administer §5 of the Voting Rights Act, the DOJ precleared Alabama's plans.[1]  *Id.,*

---

[1] As I have previously explained, §5 of the Voting Rights Act is unconstitutional. See *Shelby County* v. *Holder*, 570 U. S. ___, ___ (2013) (THOMAS, J., concurring) (slip op., at 1). And §5 no longer applies to Alabama after the Court's decision in *Shelby County.* See *id.,* at ___ (slip op., at 24) (majority opinion). Because the appellants' claims are not properly before us, however, I express no opinion on whether

at 9.

Appellants—including the Alabama Legislative Black Caucus and the Alabama Democratic Conference—saw matters differently. They sued Alabama, and on appeal they argue that the State's redistricting plans are racially gerrymandered because many districts are highly packed with black voters. According to appellants, black voters would have more voting power if they were spread over more districts rather than concentrated in the same number of districts as in previous decades. The DOJ has entered the fray in support of appellants, arguing that the State's redistricting maps fail strict scrutiny because the State focused too heavily on a single racial characteristic— the number of black voters in majority-minority districts— which potentially resulted in impermissible packing of black voters.

Like the DOJ, today's majority sides with appellants, faulting Alabama for choosing the wrong percentage of blacks in the State's majority-black districts, or at least for arriving at that percentage using the wrong reasoning. In doing so, the Court—along with appellants and the DOJ— exacerbates a problem many years in the making. It seems fitting, then, to trace that history here. The practice of creating highly packed—"safe"—majority-minority districts is the product of our erroneous jurisprudence, which created a system that forces States to segregate voters into districts based on the color of their skin. Alabama's current legislative districts have their genesis in the "max-black" policy that the DOJ itself applied to §5 throughout the 1990's and early 2000's. The 2006 amendments to §5 then effectively locked in place Ala-

––––––––––

compliance with §5 was a compelling governmental purpose at the time of Alabama's 2012 redistricting, nor do I suggest that Alabama would necessarily prevail if appellants had properly raised district-specific claims.

bama's max-black districts that were established during the 1990's and 2000's. These three problems—a jurisprudence requiring segregated districts, the distortion created by the DOJ's max-black policy, and the ossifying effects of the 2006 amendments—are the primary culprits in this case, not Alabama's redistricting policy. Nor does this Court have clean hands.

## II

This Court created the current system of race-based redistricting by adopting expansive readings of §2 and §5 of the Voting Rights Act. Both §2 and §5 prohibit States from implementing voting laws that "den[y] or abridg[e] the right to vote on account of race or color." §§10304(a), 10301(a). But both provisions extend to only certain types of voting laws: any "voting qualification or prerequisite to voting, or standard, practice, or procedure." *Ibid.* As I have previously explained, the terms "'standard, practice, or procedure' . . . refer only to practices that affect minority citizens' access to the ballot," such as literacy tests. *Holder*, 512 U. S. at 914 (opinion concurring in judgment). They do not apply to "[d]istricting systems and electoral mechanisms that may affect the 'weight' given to a ballot duly cast and counted." *Ibid.* Yet this Court has adopted far-reaching interpretations of both provisions, holding that they encompass legislative redistricting and other actions that might "dilute" the strength of minority votes. See generally *Thornburg* v. *Gingles*, 478 U. S. 30 (1986) (§2 "vote dilution" challenge to legislative districting plan); see also *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 583–587 (1969) (Harlan, J., concurring in part and dissenting in part).

The Court's interpretation of §2 and §5 have resulted in challenge after challenge to the drawing of voting districts. See, *e.g., Bartlett* v. *Strickland*, 556 U. S. 1 (2009); *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399

(2006); *Georgia* v. *Ashcroft*, 539 U. S. 461 (2003); *Reno* v. *Bossier Parish School Bd.*, 528 U. S. 320 (2000) (*Bossier II*); *Hunt* v. *Cromartie*, 526 U. S. 541 (1999); *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471 (1997) (*Bossier I*); *Bush* v. *Vera*, 517 U. S. 952 (1996); *Shaw* v. *Hunt*, 517 U. S. 899 (1996) (*Shaw II*); *Miller* v. *Johnson*, 515 U. S. 900 (1995); *United States* v. *Hays*, 515 U. S. 737 (1995); *Holder*, *supra*; *Johnson* v. *De Grandy*, 512 U. S. 997 (1994); *Growe* v. *Emison*, 507 U. S. 25 (1993); *Shaw* v. *Reno*, 509 U. S. 630 (1993) (*Shaw I*); *Voinovich* v. *Quilter*, 507 U. S. 146 (1993).

The consequences have been as predictable and as they are unfortunate. In pursuing "undiluted" or maximized minority voting power, "we have devised a remedial mechanism that encourages federal courts to segregate voters into racially designated districts to ensure minority electoral success." *Holder*, *supra,* at 892 (THOMAS, J., concurring in judgment). Section 5, the provision at issue here, has been applied to require States that redistrict to maintain the number of pre-existing majority-minority districts, in which minority voters make up a large enough portion of the population to be able to elect their candidate of choice. See, *e.g., Miller*, *supra*, at 923–927 (rejecting the DOJ's policy of requiring States to increase the number of majority-black districts because maintaining the same number of majority-black districts would not violate §5).

In order to maintain these "racially 'safe burroughs,'" States or courts must perpetually "divid[e] the country into electoral districts along racial lines—an enterprise of segregating the races into political homelands." *Holder*, *supra,* at 905 (opinion of THOMAS, J.) (internal quotation marks omitted). The assumptions underlying this practice of creating and maintaining "safe minority districts"—"that members of [a] racial group must think alike and that their interests are so distinct that they must be provided a separate body of representatives"—remain "re-

pugnant to any nation that strives for the ideal of a color-blind Constitution." *Id.,* at 905–906. And, as predicted, the States' compliance efforts have "embroil[ed] the courts in a lengthy process of attempting to undo, or at least to minimize, the damage wrought by the system we created." *Id.,* at 905. It is this fateful system that has produced these cases.

## III

### A

In tandem with our flawed jurisprudence, the DOJ has played a significant role in creating Alabama's current redistricting problem. It did so by enforcing §5 in a manner that required States, including Alabama, to create supermajority-black voting districts or face denial of pre-clearance.

The details of this so-called "max-black" policy were highlighted in federal court during Georgia's 1991 congressional redistricting. See *Johnson* v. *Miller*, 864 F. Supp. 1354, 1360–1361 (SD Ga. 1994). On behalf of the Black Caucus of the Georgia General Assembly, the American Civil Liberties Union (ACLU) submitted a redistricting proposal to the Georgia Legislature that became known as the "max-black plan." *Id.,* at 1360. The ACLU's map created two new "black" districts and "further maximized black voting strength by pushing the percentage of black voters within its majority-black districts as high as possible." *Id.,* at 1361 (internal quotation marks omitted).

The DOJ denied several of Georgia's proposals on the ground that they did not include enough majority-black districts. *Id.*, at 1366. The plan it finally approved was substantially similar to the ACLU's max-black proposal, *id.,* at 1364–1366, creating three majority-black districts, with total black populations of 56.63%, 62.27%, and

64.07%, *id.,* at 1366, and n. 12.[2]

Georgia was not the only State subject to the DOJ's maximization policy. North Carolina, for example, submitted a congressional redistricting plan after the 1990 Census, but the DOJ rejected it because it did not create a new majority-minority district, and thus "appear[ed] to minimize minority voting strength." *Shaw* v. *Barr*, 808 F. Supp. 461, 463–464 (EDNC 1992) (quoting Letter from John R. Dunne, Assistant Attorney General of N. C., Civil Rights Div., to Tiare B. Smiley, Special Deputy Attorney General of N. C. 4 (Dec. 18, 1991)). The DOJ likewise pressured Louisiana to create a new majority-black district when the State sought approval of its congressional redistricting plan following the 1990 Census. See *Hays* v. *Louisiana*, 839 F. Supp. 1188, 1190 (WD La. 1993), vacated on other grounds by *Louisiana* v. *Hays*, 512 U. S. 1230 (1994).

Although we eventually rejected the DOJ's max-black policy, see *Miller*, *supra*, at 924–927, much damage to the States' congressional and legislative district maps had already been done. In those States that had enacted districting plans in accordance with the DOJ's max-black policy, the prohibition on retrogression under §5 meant that the legislatures were effectively required to maintain those max-black plans during any subsequent redistricting. That is what happened in Alabama.

B

Alabama's 2010 redistricting plans were modeled after max-black-inspired plans that the State put in place in the

_____

[2] The District Court found it "unclear whether DOJ's maximization policy was driven more by [the ACLU's] advocacy or DOJ's own misguided reading of the Voting Rights Act," and it concluded that the "considerable influence of ACLU advocacy on the voting rights decisions of the United States Attorney General is an embarrassment." *Johnson* v. *Miller,* 864 F. Supp. 1354, 1368 (SD Ga. 1994).

1990's under the DOJ's max-black policy.  See generally *Kelley* v. *Bennett*, 96 F. Supp. 2d 1301 (MD Ala. 2000), vacated on other grounds by *Sinkfield* v. *Kelley*, 531 U. S. 28 (2000) (*per curiam*).

Following the 1990 Census, the Alabama Legislature began redrawing its state legislative districts.  After several proposals failed in the legislature, a group of plaintiffs sued, and the State entered into a consent decree agreeing to use the "Reed-Buskey" plan.  96 F. Supp. 2d, at 1309. The primary designer of this plan was Dr. Joe Reed, the current chairman of appellant Alabama Democratic Conference.  According to Dr. Reed, the previous plan from the 1980's was not "fair" because it did not achieve the number of "black-preferred" representatives that was proportionate to the percentage of blacks in the population.  *Id.,* at 1310.  And because of the DOJ's max-black policy, "it was widely assumed that a state could (and, according to DOJ, had to) draw district lines with the primary intent of maximizing election of black officials."  *Id.*, at 1310, n. 14. "Dr. Reed thus set out to maximize the number of black representatives and senators elected to the legislature by maximizing the number of black-majority districts."  *Id.,* at 1310.  Illustrating this strategy, Alabama's letter to the DOJ seeking preclearance of the Reed-Buskey plan "emphasize[d] the Plan's deliberate creation of enough majority-black districts to assure nearly proportional representation in the legislature," *ibid.*, n. 14 and boasted that the plan had created four new majority-black districts and two additional majority-black Senate districts.  *Ibid.*

Dr. Reed populated these districts with a percentage of black residents that achieved an optimal middle ground— a "happy medium"—between too many and too few.  *Id.,* at 1311.  Twenty-three of the twenty-seven majority-black House districts were between 60% and 70% black under Reed's plan, *id.,* at 1311, and Senate District 26—one of the districts at issue today—was pushed from 65% to 70%

black. *Id.,* at 1315.[3] A District Court struck down several districts created in the Reed-Buskey plan as unconstitutionally based on race. *Id.,* at 1324. This Court reversed, however, holding that the plaintiffs lacked standing because they did not live in the gerrymandered districts. *Sinkfield*, *supra,* at 30–31.

The Reed-Buskey plan thus went into effect and provided the template for the State's next redistricting efforts in 2001. See *Montiel* v. *Davis*, 215 F. Supp. 2d 1279, 1282 (SD Ala. 2002). The 2001 maps maintained the same number of majority-black districts as the Reed-Buskey plan had created: 27 House districts and 8 Senate districts. *Ibid.* And "to maintain the same relative percentages of black voters in those districts," the legislature "redrew the districts by shifting more black voters into the majority-black districts." App. to Juris. Statement 4. The State's letters requesting preclearance of the 2001 plans boasted that the maps maintained the same number of majority-black districts and the same (or higher) percentages of black voters within those districts, other than "slight reductions" that were "necessary to satisfy other legitimate, nondiscriminatory redistricting considerations." Letter from William H. Pryor, Alabama Attorney General, to Voting Section Chief, Civil Rights Division, Department of Justice 6–7 (Aug. 14, 2001) (Senate districts); Letter from William H. Pryor, Alabama Attorney

───────────

[3] In this litigation, Dr. Reed and the Alabama Democratic Conference argue that the percentage of black residents needed to maintain the ability to elect a black-preferred candidate is lower than it was in the 2000's because black participation has increased over the last decade. Brief for Appellants in No. 13–1138, pp. 39–40. Although appellants disclaim any argument that the State must achieve an optimal percentage of black voters in majority-black districts, *id.*, at 35, it is clear that that is what they seek: a plan that maximizes voting strength by maintaining "safe" majority-minority districts while also spreading black voters into other districts where they can influence elections. *Id.*, at 17–18.

General, to Voting Section Chief, Civil Rights Division, Department of Justice 7, 9 (Sept. 4, 2001) (House districts).

Section 5 tied the State to those districts: Under this Court's §5 precedents, States are prohibited from enacting a redistricting plan that "would lead to a retrogression in the position of racial minorities." *Beer* v. *United States*, 425 U. S. 130, 141 (1976). In other words, the State could not retrogress from the previous plan if it wished to comply with §5.

IV

Alabama's quandary as it attempted to redraw its legislative districts after 2010 was exacerbated by the 2006 amendments to §5. Those amendments created an inflexible definition of "retrogression" that Alabama understandably took as requiring it to maintain the same percentages of minority voters in majority-minority districts. The amendments thus provide the last piece of the puzzle that explains why the State sought to maintain the same percentages of blacks in each majority-black district.

Congress passed the 2006 amendments in response to our attempt to define "retrogression" in *Georgia* v. *Ashcroft*, 539 U. S. 461. Prior to that decision, practically any reapportionment change could "be deemed 'retrogressive' under our vote dilution jurisprudence by a court inclined to find it so." *Bossier I*, 520 U. S., at 490–491 (THOMAS, J., concurring). "[A] court could strike down *any* reapportionment plan, either because it did not include enough majority-minority districts or because it did (and thereby diluted the minority vote in the remaining districts)." *Id.,* at 491. Our §5 jurisprudence thus "inevitably force[d] the courts to make political judgments regarding which type of apportionment best serves supposed minority interests— judgments courts are ill equipped to make." *Id.,* at 492.

We tried to pull the courts and the DOJ away from

making these sorts of judgments in *Georgia* v. *Ashcroft*, *supra*. Insofar as §5 applies to the drawing of voting districts, we held that a District Court had wrongly rejected Georgia's reapportionment plan, and we adopted a retrogression standard that gave States flexibility in determining the percentage of black voters in each district. *Id.,* at 479–481. As we explained, "a State may choose to create a certain number of 'safe' districts, in which it is highly likely that minority voters will be able to elect the candidate of their choice." *Id.,* at 480. Alternatively, "a State may choose to create a greater number of districts in which it is likely—although perhaps not quite as likely as under the benchmark plan—that minority voters will be able to elect candidates of their choice." *Ibid.* We noted that "spreading out minority voters over a greater number of districts creates more districts in which minority voters may have the opportunity to elect a candidate of their choice," even if success is not guaranteed, and even if it diminished the chance of electing a representative in some districts. *Id.,* at 481. Thus, States would be permitted to make judgments about how best to prevent retrogression in a minority group's voting power, including assessing the range of appropriate minority population percentages within each district. *Id.,* at 480–481.

In response, Congress amended §5 and effectively overruled *Georgia* v. *Ashcroft*. See 120 Stat. 577. The 2006 amendments added subsection (b), which provides:

> "Any voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting that has the purpose or will have the effect of diminishing the ability of any citizens of the United States on account of race or color . . . to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of . . . this section." 52 U. S. C. §10304(b). See §5, 120 Stat. 577.

Thus, any change that has the effect of "diminishing the ability" of a minority group to "elect their preferred candidate of choice" is retrogressive.

Some were rightly worried that the 2006 amendments would impose too much inflexibility on the States as they sought to comply with §5. Richard Pildes, who argued on behalf of the Alabama Democratic Conference in these cases, testified in congressional hearings on the 2006 amendments. He explained that *Georgia* v. *Ashcroft* "recognizes room . . . for some modest flexibility in Section 5," and warned that if "Congress overturns *Georgia* v. *Ashcroft*, it will make even this limited amount of flexibility illegal." Hearing on the Continuing Need for Section 5 Pre-Clearance before the Senate Committee on the Judiciary, 109th Congress, 2d Sess., pp. 11–12 (2006). Pildes also observed that the proposed standard of "no 'diminished ability to elect' . . . has a rigidity and a mechanical quality that can lock into place minority districts in the south at populations that do not serve minority voters' interests." *Id.,* at 12. Although this testimony says nothing about how §5 ought to be interpreted, it tells us that the Alabama Democratic Conference's own attorney believes that the State was subject to a "rigi[d]" and "mechanical" standard in determining the number of black voters that must be maintained in a majority-black district.

V

All of this history explains Alabama's circumstances when it attempted to redistrict after the 2010 Census. The legislature began with the max-black district maps that it inherited from the days of Reed-Buskey. Using these inherited maps, combined with population data from the 2010 Census, many of the State's majority-black House and Senate districts were between 60% and 70% black, and some were over 70%. App. to Juris. Statement

103–108. And the State was prohibited from drawing new districts that would "have the effect of diminishing the ability" of blacks "to elect their preferred candidates of choice." §10304(b). The legislature thus adopted a policy of maintaining the same number of majority-black districts and roughly the same percentage of blacks within each of those districts. See *ante,* at 16.

The majority faults the State for taking this approach. I do not pretend that Alabama is blameless when it comes to its sordid history of racial politics. But, today the State is not the one that is culpable. Its redistricting effort was indeed tainted, but it was tainted by our voting rights jurisprudence and the uses to which the Voting Rights Act has been put. Long ago, the DOJ and special-interest groups like the ACLU hijacked the Act, and they have been using it ever since to achieve their vision of maximized black electoral strength, often at the expense of the voters they purport to help. States covered by §5 have been whipsawed, first required to create "safe" majority-black districts, then told not to "diminis[h]" the ability to elect, and now told they have been too rigid in preventing any "diminishing" of the ability to elect. *Ante,* at 17–18.

Worse, the majority's solution to the appellants' gerrymandering claims requires States to analyze race even *more* exhaustively, not less, by accounting for black voter registration and turnout statistics. *Ante,* at 18–19. The majority's command to analyze black voting patterns en route to adopting the "correct" racial quota does nothing to ease the conflict between our color-blind Constitution and the "consciously segregated districting system" the Court has required in the name of equality. *Holder*, 512 U. S., at 907. Although I dissent today on procedural grounds, I also continue to disagree with the Court's misguided and damaging jurisprudence.