*1485 Justice THOMAS, concurring.
I join the opinion of the Court because it correctly applies our precedents under the Constitution and the Voting Rights Act of 1965 (VRA), 52 U.S.C. § 10301 et seq . I write briefly to explain the additional grounds on which I would affirm the three-judge District Court and to note my agreement, in particular, with the Court's clear-error analysis.
As to District 1, I think North Carolina's concession that it created the district as a majority-black district is by itself sufficient to trigger strict scrutiny. See Brief for Appellants 44; see also, e.g., Bethune-Hill v. Virginia State Bd. of Elections, 580 U.S. ----, ---- - -----, 137 S.Ct. 788, 803-804, 197 L.Ed.2d 85 (2017) (THOMAS, J., concurring in judgment in part and dissenting in part). I also think that North Carolina cannot satisfy strict scrutiny based on its efforts to comply with § 2 of the VRA. See ante, at 1469. In my view, § 2 does not apply to redistricting and therefore cannot justify a racial gerrymander. See *1486 Holder v. Hall, 512 U.S. 874, 922-923, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (THOMAS, J., concurring in judgment).
As to District 12, I agree with the Court that the District Court did not clearly err when it determined that race was North Carolina's predominant motive in drawing the district. See ante, at 1474. This is the same conclusion I reached when we last reviewed District 12. Easley v. Cromartie, 532 U.S. 234, 267, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) ( Cromartie II ) (dissenting opinion). The Court reached the contrary conclusion in Cromartie II only by misapplying our deferential standard for reviewing factual findings. See id., at 259-262, 121 S.Ct. 1452. Today's decision does not repeat Cromartie II 's error, and indeed it confines that case to its particular facts. It thus represents a welcome course correction to this Court's application of the clear-error standard.
Justice ALITO, with whom THE CHIEF JUSTICE and Justice KENNEDY join, concurring in the judgment in part and dissenting in part.
A precedent of this Court should not be treated like a disposable household item-say, a paper plate or napkin-to be used once and then tossed in the trash. But that is what the Court does today in its decision regarding North Carolina's 12th Congressional District: The Court junks a rule adopted in a prior, remarkably similar challenge to this very same congressional district.
In Easley v. Cromartie, 532 U.S. 234, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (Cromartie II ), the Court considered the constitutionality of the version of District 12 that was adopted in 1997. Id., at 238, 121 S.Ct. 1452. That district had the same basic shape as the district now before us, and the challengers argued that the legislature's predominant reason for adopting this configuration was race. Ibid. The State responded that its motive was not race but politics. Id., at 241, 121 S.Ct. 1452. Its objective, the State insisted, was to create a district in which the Democratic candidate would win. See ibid. ; Brief for State Appellants in Easley v. Cromartie, O.T. 2000, Nos. 99-1864, 99-1865, p. 25. Rejecting that explanation, a three-judge court found that the legislature's predominant motive was racial, specifically to pack African-Americans into District 12. See Cromartie v. Hunt, 133 F.Supp.2d 407, 420 (E.D.N.C.2000). But this Court held that this finding of fact was clearly erroneous. Cromartie II, 532 U.S., at 256, 121 S.Ct. 1452.
A critical factor in our analysis was the failure of those challenging the district to come forward with an alternative redistricting map that served the legislature's political objective as well as the challenged version without producing the same racial effects. Noting that race and party affiliation in North Carolina were "highly correlated," id., at 243, 121 S.Ct. 1452 we laid down this rule:
"In a case such as this one ..., the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles. That party must also show that those districting alternatives would have brought about significantly greater racial balance. Appellees failed to make any such showing here." Id., at 258, 121 S.Ct. 1452.
Now, District 12 is back before us. After the 2010 census, the North Carolina Legislature, with the Republicans in the majority, drew the present version of District 12. The challengers contend that this version violates equal protection because the predominant motive of the legislature *1487 was racial: to pack the district with African-American voters. The legislature responds that its objective was political: to pack the district with Democrats and thus to increase the chances of Republican candidates in neighboring districts.
You might think that the Cromartie II rule would be equally applicable in this case, which does not differ in any relevant particular, but the majority executes a stunning about-face. Now, the challengers' failure to produce an alternative map that meets the Cromartie II test is inconsequential. It simply "does not matter." Ante, at 1479.
This is not the treatment of precedent that state legislatures have the right to expect from this Court. The failure to produce an alternative map doomed the challengers in Cromartie II, and the same should be true now. Partisan gerrymandering is always unsavory, but that is not the issue here. The issue is whether District 12 was drawn predominantly because of race. The record shows that it was not.[1]
I
Under the Constitution, state legislatures have "the initial power to draw districts for federal elections." Vieth v. Jubelirer, 541 U.S. 267, 275, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion).[2] This power, of course, must be exercised in conformity with the Fourteenth Amendment's Equal Protection Clause. And because the Equal Protection Clause's "central mandate is racial neutrality in governmental decisionmaking," Miller v. Johnson, 515 U.S. 900, 904, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), "effort[s] to separate voters into different districts on the basis of race" must satisfy the rigors of strict scrutiny. Shaw v. Reno, 509 U.S. 630, 649, 653, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (Shaw I ).
We have stressed, however, that courts are obligated to "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." Miller, 515 U.S., at 916, 115 S.Ct. 2475. "Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions," and "the good faith of a state legislature must be presumed." Id., at 915, 115 S.Ct. 2475. A legislature will "almost always be aware of racial demographics" during redistricting, but evidence of such awareness does not show that the legislature violated equal protection. Id., at 916, 115 S.Ct. 2475. Instead, the Court has held, "[r]ace must not simply have been a motivation for the drawing of a majority-minority district, but the predominant factor motivating the legislature's districting decision." Cromartie II, 532 U.S., at 241, 121 S.Ct. 1452 (citation and internal quotation marks omitted; emphasis in original).
This evidentiary burden "is a demanding one." Ibid. (internal quotation marks omitted). Thus, although "[t]he legislature's motivation is ... a factual question," Hunt v. Cromartie, 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (Cromartie I ), an appellate court conducting clear-error review must always keep in mind the heavy evidentiary obligation *1488 borne by those challenging a districting plan. See Cromartie II, supra, at 241, 257, 121 S.Ct. 1452. Recognizing "the intrusive potential of judicial intervention into the legislative realm," Miller, supra, at 916, 115 S.Ct. 2475 we have warned that courts must be very cautious about imputing a racial motive to a State's redistricting plan.
II
That caution "is especially appropriate ... where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated." Cromartie II, 532 U.S., at 242, 121 S.Ct. 1452. We have repeatedly acknowledged the problem of distinguishing between racial and political motivations in the redistricting context. See id., at 242, 257-258, 121 S.Ct. 1452 ; Cromartie I, supra, at 551-552, 119 S.Ct. 1545 ; Bush v. Vera, 517 U.S. 952, 967-968, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion).
The problem arises from the confluence of two factors. The first is the status under the Constitution of partisan gerrymandering. As we have acknowledged, "[p]olitics and political considerations are inseparable from districting and apportionment," Gaffney v. Cummings, 412 U.S. 735, 753, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), and it is well known that state legislative majorities very often attempt to gain an electoral advantage through that process. See Davis v. Bandemer, 478 U.S. 109, 129, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). Partisan gerrymandering dates back to the founding, see Vieth, supra, at 274-276, 124 S.Ct. 1769 (plurality opinion), and while some might find it distasteful, "[o]ur prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were conscious of that fact." Cromartie I, supra, at 551, 119 S.Ct. 1545 (emphasis in original); Vera, supra, at 964, 116 S.Ct. 1941 (plurality opinion).
The second factor is that "racial identification is highly correlated with political affiliation" in many jurisdictions. Cromartie II, 532 U.S., at 243, 121 S.Ct. 1452 (describing correlation in North Carolina). This phenomenon makes it difficult to distinguish between political and race-based decisionmaking. If around 90% of African-American voters cast their ballots for the Democratic candidate, as they have in recent elections,[3] a plan that packs Democratic voters will look very much like a plans that packs African-American voters. "[A] legislature may, by placing reliable Democratic precincts within a district without regard to race, end up with a district containing more heavily African-American precincts, but the reasons would be political rather than racial." Id., at 245, 121 S.Ct. 1452.
A
We addressed this knotty problem in Cromartie II, which, as noted, came to us *1489 after the District Court had held a trial and found as a fact that the legislature's predominant reason for drawing District 12 was race, not politics. Id ., at 239-241, 121 S.Ct. 1452. Our review for clear error in that case did not exhibit the same diffidence as today's decision. We carefully examined each piece of direct and circumstantial evidence on which the District Court had relied and conceded that this evidence provided support for the court's finding. Id., at 257, 121 S.Ct. 1452. Then, at the end of our opinion, we stated:
"We can put the matter more generally as follows: In a case such as this one where majority-minority districts (or the approximate equivalent) are at issue and where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles. That party must also show that those districting alternatives would have brought about significantly greater racial balance." Id., at 258, 121 S.Ct. 1452.
Because the plaintiffs had "failed to make any such showing," we held that the District Court had clearly erred in finding that race predominated in drawing District 12. Ibid.
Cromartie II plainly meant to establish a rule for use in a broad class of cases and not a rule to be employed one time only. We stated that we were "put [ting] the matter more generally" and were describing what must be shown in cases "where majority-minority districts (or the approximate equivalent) are at issue and where racial identification correlates highly with political affiliation." Ibid. We identified who would carry the burden of the new rule ("the party attacking the legislatively drawn boundaries") and what that party must show (that "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles" while achieving "significantly greater racial balance"). Ibid. And we reversed the finding of racial predominance due to the plaintiffs' failure to carry the burden established by this evidentiary rule. Ibid.
Here, too, the plaintiffs failed to carry that burden. In this case, as in Cromartie II, the plaintiffs allege a racial gerrymander, and the State's defense is that political motives explain District 12's boundaries. In such a case, Cromartie II instructed, plaintiffs must submit an alternative redistricting map demonstrating that the legislature could have achieved its political goals without the racial effects giving rise to the racial gerrymandering allegation. But in spite of this instruction, plaintiffs in this case failed to submit such a map.[4] See Brief for Appellees 31-36. Based on what we said in Cromartie II about the same type of claim involving the same congressional district, reversal should be a foregone conclusion. It turns out, however, that the Cromartie II rule was good for one use only. Even in a case involving the very same district, it is tossed aside.
B
The alternative-map requirement deserves better. It is a logical response to *1490 the difficult problem of distinguishing between racial and political motivations when race and political party preference closely correlate.
This is a problem with serious institutional and federalism implications. When a federal court says that race was a legislature's predominant purpose in drawing a district, it accuses the legislature of "offensive and demeaning" conduct. Miller, 515 U.S., at 912, 115 S.Ct. 2475. Indeed, we have said that racial gerrymanders "bea[r] an uncomfortable resemblance to political apartheid." Shaw I, 509 U.S., at 647, 113 S.Ct. 2816. That is a grave accusation to level against a state legislature.
In addition, "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions" because "[i]t is well settled that reapportionment is primarily the duty and responsibility of the State." Miller, supra, at 915, 115 S.Ct. 2475 (internal quotation marks omitted); see also Cromartie II, 532 U.S., at 242, 121 S.Ct. 1452. When a federal court finds that race predominated in the redistricting process, it inserts itself into that process. That is appropriate-indeed, constitutionally required-if the legislature truly did draw district boundaries on the basis of race. But if a court mistakes a political gerrymander for a racial gerrymander, it illegitimately invades a traditional domain of state authority, usurping the role of a State's elected representatives. This does violence to both the proper role of the Judiciary and the powers reserved to the States under the Constitution.
There is a final, often-unstated danger where race and politics correlate: that the federal courts will be transformed into weapons of political warfare. Unless courts "exercise extraordinary caution" in distinguishing race-based redistricting from politics-based redistricting, Miller, supra, at 916, 115 S.Ct. 2475 they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena. If the majority party draws districts to favor itself, the minority party can deny the majority its political victory by prevailing on a racial gerrymandering claim. Even if the minority party loses in court, it can exact a heavy price by using the judicial process to engage in political trench warfare for years on end.
Although I do not imply that this is what occurred here, this case does reflect what litigation of this sort can look like. This is the fifth time that North Carolina's 12th Congressional District has come before this Court since 1993, and we have almost reached a new redistricting cycle without any certainty as to the constitutionality of North Carolina's current redistricting map. Given these dangers, Cromartie II was justified in crafting an evidentiary rule to prevent false positives.[5]
C
The majority nevertheless absolves the challengers of their failure to submit an alternative map. It argues that an alternative map cannot be "the only means" of proving racial predominance, and it concludes from this that an alternative map "does not matter in this case." Ante, at 1479 (emphasis in original). But even if *1491 there are cases in which a plaintiff could prove a racial gerrymandering claim without an alternative map, they would be exceptional ones in which the evidence of racial predominance is overwhelming. This most definitely is not one of those cases, see Part III-C, infra, and the plaintiffs' failure to produce an alternative map mandates reversal. Moreover, even in an exceptional case, the absence of such a map would still be strong evidence that a district's boundaries were determined by politics rather than race.[6] The absence of a map would "matter." Cf. ante, at 1479.
The majority questions the legitimacy of the alternative-map requirement, ante, at 1478 - 1480, and n. 15, but the rule is a sound one. It rests on familiar principles regarding the allocation of the burdens of production and persuasion and the assessment of evidence. First, in accordance with the general rule in civil cases, plaintiffs in a case like this bear the burden of proving that the legislature's motive was unconstitutional. Second, what must be shown is not simply that race played a part in the districting process but that it played the predominant role. Third, a party challenging a districting plan must overcome the strong presumption that the plan was drawn for constitutionally permissible reasons. Miller, supra, at 915, 115 S.Ct. 2475. Fourth, when those responsible for adopting a challenged plan contend that the plan was devised for partisan political ends, they are making an admission that may not sit well with voters, so the explanation should not be lightly dismissed. Cf. Fed. Rule Evid. 804(b)(3). And finally, the Cromartie II rule takes into account the difficulty of proving a negative.
For challengers like those in the present case, producing a map that meets the Cromartie II test should not be hard if the predominant reason for a challenged plan really was race and not politics. Plaintiffs mounting a challenge to a districting plan are almost always sophisticated litigants who have the assistance of experts, and that is certainly true in the present case. Today, an expert with a computer can easily churn out redistricting maps that control for any number of specified criteria, including prior voting patterns and political party registration. Therefore, if it is indeed possible to find a map that meets the Cromartie II test, it should not be too hard for the challengers to do so. The State, on the other hand, cannot prove that no map meeting the Cromartie II test can be drawn. Even if a State submits, say, 100 alternative maps that fail the test, that would not prove that no such map could pass it. The relative ease with which the opposing parties can gather evidence is a familiar consideration in allocating the burden of production. See 1 C. Mueller & L. Kirkpatrick, Federal Evidence § 63, p. 316 (2d ed. 1994); 21 C. Wright & K. Graham, Federal Practice and Procedure § 5122, pp. 556-557 (1977).
III
Even if we set aside the challengers' failure to submit an alternative map, the District Court's finding that race predominated in the drawing of District 12 is clearly erroneous. The State offered strong and coherent evidence that politics, not race, was the legislature's predominant aim, and the evidence supporting the District Court's contrary finding is weak and manifestly inadequate in light of the high *1492 evidentiary standard that our cases require challengers to meet in order to prove racial predominance.[7]
My analysis will proceed in three steps. First, I will discuss what the legislature's mapmaker did and why this approach is entirely consistent with his stated political objectives. Then, I will explain why this approach inevitably had the racial effect to which the challengers object. Finally, I will address the evidence of racial predominance on which the majority relies and show why it is inadequate to sustain the District Court's judgment.
A
In order to understand the mapmaker's approach, the first element to be kept in mind is that the basic shape of District 12 was legitimately taken as a given. When a new census requires redistricting, it is a common practice to start with the plan used in the prior map and to change the boundaries of the prior districts only as needed to comply with the one-person, one-vote mandate and to achieve other desired ends. This approach honors settled expectations and, if the prior plan survived legal challenge, minimizes the risk that the new plan will be overturned. And that is the approach taken by the veteran mapmaker in the present case, Dr. Thomas Hofeller. App. 523 ("the normal starting point is always from the existing districts").
Dr. Hofeller began with the prior version of District 12 even though that version had a strange, serpentine shape. Cromartie I, 526 U.S., at 544, 119 S.Ct. 1545 ; App. 1163. That design has a long history. It was first adopted in 1992, and subsequent redistricting plans have built on the 1992 plan. Ibid. In CromartieII, we sustained the constitutionality of the 1997 version of District 12, which featured the same basic shape. See 532 U.S., at 258, 121 S.Ct. 1452. And retention of this same basic shape is not challenged in this case.[8]
Using the prior design as his starting point, Dr. Hofeller assumed that District 12 would remain a "strong Democratic distric[t]." App. 521. He stated that he drew "the [overall redistricting] plan to ... have an increased number of competitive districts for GOP candidates," id ., at 520, and that he therefore moved more Democratic voters into District 12 in order to "increase Republican opportunities in the surrounding districts," id ., at 1606.
*1493 Under the map now before us, District 12 is bordered by four districts.[9] Running counterclockwise, they are: District 5 to the northwest; District 9 to the southwest; District 8 to the southeast; and District 6 to the northeast. See Appendix, ante . According to Dr. Hofeller, the aim was to make these four districts-considered as a whole-more secure for Republicans. App. 1606, 2696.
To do this, Dr. Hofeller set out in search of pockets of Democratic voters that could be moved into District 12 from areas adjoining or very close to District 12's prior boundaries. Of the six counties through which District 12 passes, the three most heavily Democratic (and also the most populous) are Forsyth, Guilford, and Mecklenburg, which contain the major population centers of Winston-Salem, Greensboro, and Charlotte, respectively. See 7 Record 480-482; App. 1141. As a measure of voting preferences, Dr. Hofeller used the results of the then-most recent Presidential election, i.e., the election of 2008. Id., at 1149, 2697, 2721-2722. In that election, these three counties voted strongly for the Democratic candidate, then-Senator Barack Obama, while the other three counties, Cabarrus, Davidson, and Rowan, all voted for the Republican candidate, Senator John McCain. See 4 Record 1341-1342.
Two of the three Democratic counties, Forsyth and Guilford, are located at the northern end of District 12, while the other Democratic county, Mecklenburg, is on the southern end. See Appendix, ante. The middle of the district (often called the "corridor") passes through the three more Republican-friendly counties-Cabarrus, Davidson, and Rowan. Ibid. Thus, if a mapmaker sat down to increase the proportion of Democrats in District 12 and to reduce the proportion in neighboring districts, the most obvious way to do that was to pull additional Democrats into the district from the north and south (the most populous and heavily Democratic counties) while shifting Republican voters out of the corridor.
That, in essence, is what Dr. Hofeller did-as the majority acknowledges. Ante, at 1466 (Dr. Hofeller "narrow[ed District 12's] already snakelike body while adding areas at either end"); App. 1150 (Table 1), 1163. Dr. Hofeller testified that he sought to shift parts of Mecklenburg County out of Districts 8 and 9 (in order to reduce the percentage of Democrats in these two districts) and that this required him to increase the coverage of Mecklenburg County in District 12. Id ., at 1142-1143, 1607, 2753.
Dr. Hofeller testified that he also had political plans for the current map's District 6, which differed substantially from the version in the prior map. Dr. Hofeller wanted to improve the Republicans' prospects in this new district by minimizing its coverage of Guilford County's Democratic population. Id., at 1143, 1607, 2693, 2697, 2752. That also meant increasing the population of Guilford County Democrats in District 12. Id ., at 1143, 1607, 2697.
This influx of Democratic voters from the two most populous counties in District 12 required shedding voters elsewhere in order to comply with this Court's mandate of one-person, one-vote, see Kirkpatrick v. Preisler, 394 U.S. 526, 530-531, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969),[10] and the population removed had to be added to a bordering district. App. 523. Parts of *1494 Davidson and Rowan Counties were therefore shifted to District 5, id ., at 1143, 1150 (Table 1), but Dr. Hofeller testified that this would not have been sufficient to satisfy the one-person, one-vote standard, so he also had to move voters from heavily Democratic Forsyth County into District 5, id ., at 1143, 2697, 2752-2753. Doing so did not undermine his political objective, he explained, because District 5 "was stronger [for Republicans] to begin with and could take those [Forsyth] Democratic precincts" without endangering Republican chances in the district. Id ., at 2753; see also id ., at 2697. The end result was that, under the new map now at issue, the three major counties in the north and south constitute a larger percentage of District 12's total population, while the corridor lost population. See id ., at 1150 (Table 1), 2149 (Finding 187).
A comparison of the 2008 Presidential election vote under the old and new versions of the districts shows the effect of Dr. Hofeller's map. District 8 (which, of the four districts bordering District 12 under the 2011 map, was the most Democratic district) saw a drop of almost 11% in the Democratic vote under the new map. See 2 Record 354, 421. District 9 saw a drop in the percentage of registered Democrats, id., at 350, 417, although the vote percentage for the Democratic Presidential candidate remained essentially the same (increasing by 0.39%). Id., at 354, 421. District 5, which was heavily Republican under the prior map and was redrawn to absorb Democrats from Forsyth County, saw about a 7-point swing in favor of the Democratic candidate, but it remained a strong Republican district. Ibid. New District 6 is less susceptible to comparison because its boundaries are completely different from the district bearing that number under the old plan, but the new District 6 was solidly Republican, with a Republican Presidential vote percentage of nearly 56%. Ibid. As stated by the state court that considered and rejected the same constitutional challenge now before us:
"By increasing the number of Democratic voters in the 2011 Twelfth Congressional District located in Mecklenburg and Guilford Counties, the 2011 Congressional Plan created other districts that were more competitive for Republican candidates as compared to the 2001 versions of these districts...." App. 2150 (Finding 191).
The results of subsequent congressional elections show that Dr. Hofeller's plan achieved its goal. In 2010, prior to the adoption of the current plan, Democrats won 7 of the 13 districts, including District 8.[11] But by 2016, Republicans controlled 10 of the 13 districts, including District 8, and all the Republican candidates for the House of Representatives won their races with at least 56% of the vote.[12] In accordance with the map's design, the only Democratic seats remaining after 2016 were in Districts 1, 4, and 12. Id., at 521.
In sum, there is strong evidence in the record to support Dr. Hofeller's testimony that the changes made to the 2001 map were designed to maximize Republican opportunities.
B
I now turn to the connection between the mapmaker's strategy and the effect on *1495 the percentage of African-Americans in District 12.
As we recognized in Cromartie II, political party preference and race are highly correlated in North Carolina generally and in the area of Congressional District 12 in particular. App. 2022 (state trial court finding that "racial identification correlates highly with political affiliation" in North Carolina). The challenger's expert, Dr. Stephen Ansolabehere, corroborated this important point. Dr. Ansolabehere calculated the statewide correlation between race and voting in 2008[13] and found a correlation of 0.8, which is "very high." Id., at 342, 352 (Table 1). See also J. Levin, J. Fox, & D. Forde, Elementary Statistics in Social Research 370 (12th ed. 2014); R. Witte & J. Witte, Statistics 138 (10th ed. 2015).
In the area of District 12, the correlation is even higher. There, Dr. Ansolabehere found that the correlation "approach[ed] 1," App. 342, that is, almost complete overlap. These black Democrats also constitute a supermajority of Democrats in the area covered by the district. Under the 2001 version of District 12-which was drawn by Democrats and was never challenged as a racial gerrymander-black registered voters constituted 71.44% of Democrats in the district. 2 Record 350; see also App. 2145 (Finding 173).[14] What this means is that a mapmaker seeking to pull Democrats into District 12 would unavoidably pull in a very large percentage of African-Americans.
The distribution of Democratic voters magnified this effect. Dr. Hofeller's plan required the identification of areas of Democratic strength that were near District 12's prior boundaries. Dr. Hofeller prepared maps showing the distribution of Democratic voters by precinct,[15] see id ., at 1148-1149, 1176-1177, 1181, and those maps show that these voters were highly concentrated around the major urban areas of Winston-Salem (in Forsyth County), Greensboro (in Guilford County), and Charlotte (in Mecklenburg County). Dr. Ansolabehere, the challengers' expert, prepared maps showing the distribution of black registered voters in these same counties, see id ., at 322-328; 1 Record 128-133, and a comparison of these two sets of maps reveals that the clusters of Democratic voters generally overlap with those of registered black voters. In other words, the population of nearby Democrats who could be moved into District 12 was heavily black.
*1496 The upshot is that, so long as the legislature chose to retain the basic shape of District 12 and to increase the number of Democrats in the district, it was inevitable that the Democrats brought in would be disproportionately black.
None of this should come as a surprise. After all, when the basic shape of District 12 was created after the 1990 census, the express goal of the North Carolina Legislature was to create a majority-minority district. See Shaw I, 509 U.S., at 633-636, 113 S.Ct. 2816. It has its unusual shape because it was originally designed to capture pockets of black voters. See Shaw v. Hunt, 517 U.S. 899, 905-906, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (Shaw II ). Although the legislature has modified the district since then, see Cromartie I, 526 U.S., at 544, 119 S.Ct. 1545 (describing changes from the 1991 version to the 1997 version), "it retains its basic 'snakelike' shape and continues to track Interstate 85." Ibid. ; 1 Record 35 (Appellees' Complaint) ("Congressional District 12 has existed in roughly its current form since 1992, when it was drawn as a majority African-American district ..."); see also App. 1163 (showing the 1997, 2001, and 2011 versions of District 12). The original design of the district was devised to ensure a high concentration of black voters, and as long as the basic design is retained (as it has been), one would expect that to continue.
While plaintiffs failed to offer any alternative map, Dr. Hofeller produced a map showing what District 12 would have looked like if his computer was programmed simply to maximize the Democratic vote percentage in the district, while still abiding by the requirement of one-person, one-vote. Id., at 1148. The result was a version of District 12 that is very similar to the version approved by the North Carolina Legislature. See id ., at 1175; id ., at 1615-1618. Indeed, this maximum-Democratic plan had a black voting age population of 50.73%, which is actually higher than District 12's black voting age population of 50.66%. Id., at 1154 (Table 5).
Thus, the increase in the black voting age population of District 12 is easily explained by a coherent (and generally successful) political strategy. Cromartie II, 532 U.S., at 245, 121 S.Ct. 1452 ("[A] legislature may, by placing reliable Democratic precincts within a district without regard to race, end up with a district containing more heavily African-American precincts, but the reasons would be political rather than racial").
Amazingly, a reader of the majority opinion (and the opinion of the District Court) would remain almost entirely ignorant of the legislature's political strategy and the relationship between that strategy and the racial composition of District 12.[16] The majority's analysis is like Hamlet without the prince.[17]
*1497 C
The majority focuses almost all its attention on a few references to race by those responsible for the drafting and adoption of the redistricting plan. But the majority reads far too much into these references. First, what the plaintiffs had to prove was not simply that race played some role in the districting process but that it was the legislature's predominant consideration. Second, as I have explained, a court must exercise "extraordinary caution" before finding that a state legislature's predominant reason for a districting plan was racial. Miller, 515 U.S., at 916, 115 S.Ct. 2475. This means that comments should not be taken out of context and given the most sinister possible meaning. Third, the findings of the state courts in a virtually identical challenge to District 12 are entitled to respectful consideration. A North Carolina trial court, after hearing much the same evidence as the court below, found that the legislature's predominant motive was political, not racial. That decision was affirmed by the North Carolina Supreme Court. Dickson v. Rucho, 367 N.C. 542, 766 S.E.2d 238 (2014), vacated and remanded, 575 U.S. ----, 135 S.Ct. 1843, 191 L.Ed.2d 719 aff'd on remand, 368 N.C. 481, 781 S.E.2d 404 (2015), cert. pending, No. 16-24. Even if the judgment in the state case does not bar the present case under the doctrine of res judicata, see ante, at 1466 - 1468, the state-court finding illustrates the thinness of the plaintiffs' proof.
Finally, it must be kept in mind that references to race by those responsible for drawing or adopting a redistricting plan are not necessarily evidence that the plan was adopted for improper racial reasons. Under our precedents, it is unconstitutional for the government to consider race in almost any context, and therefore any mention of race by the decisionmakers may be cause for suspicion. We have said, however, that that is not so in the redistricting context. For one thing, a State like North Carolina that was either wholly or partially within the coverage of § 5 of the Voting Rights Act of 1965 could not redistrict without heeding that provision's prohibition against racial retrogression, see 52 U.S.C. § 10304(b) ; Alabama Legislative Black Caucus v. Alabama, 575 U.S. ----, ---- - ----, 135 S.Ct. 1257, 1263-1263, 191 L.Ed.2d 314 (2015), and therefore race had to be kept in mind. In addition, all legislatures must also take into account the possibility of a challenge under § 2 of the Voting Rights Act claiming that a plan illegally dilutes the voting strength of a minority community. See League of United Latin American Citizens v. Perry, 548 U.S. 399, 425, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006). If a State ultimately concludes that it must take race into account in order to comply with the Voting Rights Act, it must show that it had a " 'strong basis in evidence' in support of the (race-based) choice that it has made." Alabama Legislative Black Caucus, supra, at ----, 135 S.Ct., at 1274. But those involved in the redistricting process may legitimately make statements about Voting Rights Act compliance before deciding that the Act does not provide a need for race-based districting. And it is understandable for such individuals to explain that a race-neutral plan happens to satisfy the criteria on which Voting Rights Act challengers might insist. In short, because of the Voting Rights Act, consideration and discussion of the racial effects of a plan may be expected.
1
The June 17, 2011, Statement
I begin with a piece of evidence that the majority does not mention, namely, the very first item cited by the District Court in support of its racial-predominance finding.
*1498 This evidence consisted of a June 17, 2001, statement by Senator Rucho and Representative Lewis, the state legislators who took the lead in the adoption of the current map. In that statement, Rucho and Lewis referred to "constructing [Voting Rights Act] majority black districts." App. 1025. Seizing upon the use of the plural term "districts," the court below seemed to think that it had found a smoking gun. Harris v. McCrory, 159 F.Supp.3d 600, 616 (M.D.N.C.2016). The State had insisted that its plan drew only one majority-minority congressional district, District 1, but since the June 17 statement "clearly refers to multiple districts that are now majority minority," ibid., the court below viewed the statement as telling evidence that an additional congressional district, presumably District 12, had been intentionally designed to be a majority-minority district and was thus based on race.
There is a glaring problem with this analysis: The June 17 statement was about state legislative districts, not federal congressional districts . See App. 1024-1033. The United States, as amicus curiae in support of plaintiffs, concedes that the District Court made a mistake by relying on the June 17 statement. Brief for United States 27, n. 13. The majority, by contrast, tries to ignore this error. But the District Court gave the June 17 statement pride-of-place in its opinion, mentioning it first in its analysis, and the District Court seemed to think that this evidence was particularly significant, stating that the reference to multiple districts was not "the result of happenstance, a mere slip of the pen." 159 F.Supp.3d, at 616. The District Court's error shows a troubling lack of precision.
2
The § 5 Preclearance Request
Under § 5 of the Voting Rights Act, North Carolina requested preclearance from the Department of Justice shortly after the Legislature approved the new congressional plan. Id., at 608. In its preclearance application, the State noted that "[o]ne of the concerns of the Redistricting Chairs was that in 1992, the Justice Department had objected to the 1991 Congressional Plan because of a failure by the State to create a second majority minority district." App. 478. The application says that the Redistricting Chairs "sought input from Congressman [Mel] Watt[, the African-American incumbent who represented District 12,] regarding options for re-drawing his district," and that after this consultation, "the Chairs had the impression that Congressman Watt would oppose any redrawing of the Twelfth District ... as originally contemplated by the 1992 Justice Department objection." Ibid. The Chairs drew District 12 "[b]ased in part on this input from Congressman Watt." Id ., at 478-479. Two sentences later in the same paragraph, the application observed that the black voting age population for District 12 went up from 43.77% to 50.66% and that therefore the district "maintains, and in fact increases, the African-American community's ability to elect their candidate of choice in District 12." Id ., at 479.
According to the majority, this statement shows a "determination to concentrate black voters in District 12." Ante, at 1462. In fact, it shows no such thing. The statement explains that Senator Rucho and Representative Lewis decided not to construct District 12 as a majority-minority district-as the 1992 Justice Department had demanded-"[b]ased in part on" the input they received from Congressman Watt, whom they thought "would oppose" drawing the district "as originally contemplated by the 1992 Justice Department objection." App. 478-479. If anything, *1499 this document cuts against a finding of racial predominance.
The statement's matter-of-fact reference to the increase in District 12's black voting age population hardly shows that the legislature altered District 12 for the purpose of causing this increase. An entirely natural interpretation is that the Redistricting Chairs simply reported this fact so that it would be before the Justice Department in the event that the Department had renewed Voting Rights Act concerns. Only by reading a great deal between the lines and adopting the most sinister possible interpretation can the statement be viewed as pointed evidence of a predominantly racial motive.
3
The Mel Watt Testimony
In both the District Court and the state trial court, Congressman Watt testified that, while the redistricting plan was being developed, Senator Rucho invited him to his home to discuss the new boundaries of District 12. Id., at 2368-2369, 1343-1344. According to Congressman Watt, Senator Rucho said that the Republican leadership wanted him to "ramp the 12th Congressional District up to over 50 percent black" because "they believed it was required ... by the Voting Rights Act." Id., at 1344, 2369, 2393. In the state proceedings, Senator Rucho denied making any such statement, id., at 1703, and another state legislator present at the meeting, Representative Ruth Samuelson, gave similar testimony, id., at 1698. Neither Senator Rucho nor Representative Samuelson testified in federal court (although their state court testimony was made part of the federal record). See id., at 2847. But the District Court credited Congressman Watt's testimony based on its assessment of his demeanor and the consistency of his recollection, 159 F.Supp.3d, at 617-618, and I accept that credibility finding for purposes of our review.[18]
But even assuming that Congressman Watt's recollection was completely accurate, all that his testimony shows is that legislative leaders at one point in the process thought that they had to draw District 12 as a majority-minority district in order to comply with the Voting Rights Act; it does not show that they actually did draw District 12 with the goal of creating a majority-minority district. And as explained in the discussion of the preclearance request above, Senator Rucho and Representative Lewis stated that they ultimately turned away from the creation of a majority-minority district after consulting with Congressman Watt. "Based in part on this input from Congressman Watt," they said they decided not to draw the district as the 1992 Department of Justice had suggested-that is, as a majority-minority district. App. 478-479.
This account is fully consistent with Congressman Watt's testimony about his *1500 meeting with Senator Rucho. Congressman Watt noted that Senator Rucho was uncomfortable with the notion of increasing the black voting age population, id., at 2369, 2393, and Congressman Watt testified that he told Senator Rucho that he was opposed to the idea, id., at 1345, 2369, 2393. So it makes sense that Senator Rucho was dissuaded from taking that course by Congressman Watt's reaction. And Dr. Hofeller consistently testified that he was never asked to meet a particular black voting age population target, see Part III-C-5, infra, and that the only data displayed on his screen when he drew District 12 was political data. See infra, at 1500, n. 19. Thus, Congressman Watt's testimony, even if taken at face value, is entirely consistent with what the preclearance request recounts: After initially contemplating the possibility of drawing District 12 as a majority-minority district, the legislative leadership met with Congressman Watt, who convinced them not to do so.
4
Dr. Hofeller's Statements About Guilford County
Under the prior map, both Guilford County and the Greensboro African-American community were divided between the 12th and 13th Districts. This had been done, Dr. Hofeller explained, "to make both the Old 12th and 13th Districts strongly Democratic." App. 1103; see also id., at 555, 2821; 1 Record 132-133 (showing racial demographics of Guilford precincts under 2001 and 2011 maps). But the Republican legislature wanted to make the area surrounding District 12 more Republican. The new map eliminated the old 13th District and created a new district bearing that number farther to the east. The territory to the north of Greensboro that had previously been in the 13th District was placed in a new district, District 6, which was constructed to be a Republican-friendly district, and the new map moved more of the Greensboro area into the new District 12. This move was entirely consistent with the legislature's stated goal of concentrating Democrats in the 12th District and making the surrounding districts hospitable to Republican candidates.
Dr. Hofeller testified that the placement of the Greensboro African-American community in the 12th District was the result of this political strategy. He stated that the portion of Guilford County absorbed by District 12 "wasn't moved into CD 12 because it had a substantial black population. It was moved into CD 12 because it had a substantial Democratic political voting record...." App. 2824. And Dr. Hofeller maintained that he was never instructed to draw District 12 as a majority-minority district or to increase the district's black voting age population. See, e.g., id., at 520, 556-558, 1099, 1603-1604, 2682-2683, 2789. Instead, he testified that political considerations determined the boundaries of District 12 and that the only data displayed on his computer screen when he drew the challenged map was voting data from the 2008 Presidential election.[19] Id., at 1149, 2697, 2721-2722.
Dr. Hofeller acknowledged, however, that there had been concern about the possibility of a Voting Rights Act challenge *1501 to this treatment of the Greensboro African-American community. Guilford County was covered by § 5 of the Voting Rights Act, and as noted, § 5 prohibits retrogression. Under the old map, the Guilford County African-American community was split between the old District 13 and District 12, and in both of those districts, black voters were able to elect the candidates of their choice by allying with white Democratic voters. Under the new map, however, if the Greensboro black community had been split between District 12 and the new Republican-friendly District 6, the black voters in the latter district would be unlikely to elect the candidate of their choice. Placing the African-American community in District 12 avoided this consequence. Even Congressman Watt conceded that there were potential § 5 concerns relating to the black community in Guilford County. Id., at 2387-2388.
The thrust of many of Dr. Hofeller's statements about the treatment of Guilford County was that the reuniting of the Greensboro black community in District 12 was nothing more than a welcome byproduct of his political strategy. He testified that he first drew the district based on political considerations and then checked to ensure that Guilford County's black population was not fractured. Id., at 2822 ("[W]hen we checked it, we found that we did not have an issue in Guilford County with fracturing the black ... community"); see also id., at 556, 2821, 2823. This testimony is entirely innocuous.
There is no doubt, however, that Dr. Hofeller also made a few statements that may be read to imply that concern about Voting Rights Act litigation was part of the motivation for the treatment of Guilford County. He testified at trial that he "was instructed [not] to use race in any form except perhaps with regard to Guilford County ." Id., at 2791 (emphasis added). See id., at 1103 (the legislature "determined that it was prudent to reunify the African-American community in Guilford County"); id., at 558 ("[I]t was decided to reunite the black community in Guilford County into the Twelfth").
These statements by Dr. Hofeller convinced the District Court that the drawing of District 12 was not a "purely ... politically driven affair." 159 F.Supp.3d, at 619. But in order to prevail, the plaintiffs had to show much more-that race was the predominant reason for the drawing of District 12, and these few bits of testimony fall far short of that showing.
Our decision in Cromartie II illustrates this point. In that case, the legislature's mapmaker made a statement that is remarkably similar to Dr. Hofeller's. Gerry Cohen, the "legislative staff member responsible for drafting districting plans," reported: " 'I have moved Greensboro Black community into the 12th, and now need to take [about] 60,000 out of the 12th. I await your direction on this.' " 532 U.S., at 254, 121 S.Ct. 1452. This admission did not persuade the Court that the legislature's predominant motive was racial. The majority ignores this obvious parallel with Cromartie II .
Moreover, in an attempt to magnify the importance of the treatment of Guilford County, the majority plays games with statistics. It states that "District 12 saw a net increase of more than 25,000 black voters in Guilford County, relative to a net gain of fewer than 35,000 across the district: So the newly added parts of that county played a major role in pushing the district's BVAP over 50%." Ante, at 1477.
This is highly misleading. First, since the black voting age population of District 12 is just barely over 50%-specifically, 50.66%-almost any decision that increased the number of voting age blacks in District 12 could be said to have "played a *1502 major role in pushing the district's BVAP over 50%."
Second, the majority provides the total number of voting age blacks added to District 12 from Guilford County (approximately 25,000) alongside the total number of voting age blacks added to the district (approximately 35,000), and this has the effect of making Guilford County look like it is the overwhelming contributor to the district's net increase in black voting age population. In truth, Mecklenburg County was by far the greatest contributor of voting age blacks to District 12 in both absolute terms (approximately 147,000) and in terms of new voting age blacks (approximately 37,000). See App. 384, 500-502. Indeed, if what matters to the majority is how much individual counties increased District 12's black voting age population percentage, Davidson County deserves attention as well, since the portion of the county within District 12 lost over 26,000 more voting age whites than blacks. Ibid. That is greater than the net number of voting age blacks added to the district by Guilford County or Mecklenburg County. Ibid. As with so much in the majority opinion, the issue here is more nuanced-and much more favorable to the State-than the majority would have it seem.
5
The July 1, 2011, Statement
For reasons similar to those just explained, the majority makes far too much of a statement issued by Senator Rucho and Representative Lewis on July 1, 2011, when the new districting plan was proposed. Particularly in light of Dr. Hofeller's later testimony about the legislature's partisan objectives, it is apparent that this statement does not paint an entirely reliable picture of the legislature's aims. The statement begins with this proclamation: "From the beginning, our goal has remained the same: the development of fair and legal congressional and legislative districts," id., at 353, and the statement seriously downplays the role of politics in the map-drawing process, acknowledging only that "we have not been ignorant of the partisan impacts of the districts we have created," id., at 361.
The statement discusses the treatment of Guilford County in a section with the heading "Compliance with the Voting Rights Act." Id., at 355-358. In that section, Rucho and Lewis state: "Because of the presence of Guilford County in the Twelfth District, we have drawn our proposed Twelfth District at a black voting age level that is above the percentage of black voting age population found in the current Twelfth District. We believe that this measure will ensure preclearance of the plan." Id., at 358.
The majority and the District Court interpret this passage to say that Rucho and Lewis decided to move black voters from Guilford County into District 12 in order to ward off Voting Rights Act liability. Ante, at 1475 ("Because of the VRA, [Rucho and Lewis] increased the number of African-Americans" in District 12 (citing 159 F.Supp.3d, at 617 ; emphasis in original)). But that is hardly the only plausible interpretation. The statement could just as easily be understood as "an explanation by [the] legislature that because they chose to add Guilford County back into CD 12, the district ended up with an increased ability to elect African-American candidates, rather than the legislature explaining that they chose to add Guilford County back into CD 12 because of the [racial] results that addition created." Id., at 635 (Osteen, J., concurring in part and dissenting in part) (emphasis in original). And because we are obligated to presume the good faith of the North Carolina Legislature, this latter interpretation is the appropriate one.
*1503 But even if one adopts the majority's interpretation, it adds little to the analysis. The majority's close and incriminating reading of a statement issued to win public support for the new plan may represent poetic justice: Having attempted to blur the partisan aim of the new District 12, the legislature is hoisted on its own petard. But poetic justice is not the type of justice that we are supposed to dispense. This statement is some evidence that race played a role in the drawing of District 12, but it is a mistake to give this political statement too much weight.
Again, we made precisely this point in Cromartie II . There, the "legislative redistricting leader," then-Senator Roy Cooper, testified before a legislative committee that the proposed plan " 'provides for ... racial and partisan balance .' " 532 U.S., at 253, 121 S.Ct. 1452 (emphasis added). The District Court read the statement literally and concluded that the district had been drawn with a racial objective. Ibid. But this Court dismissed the statement, reasoning that although "the phrase shows that the legislature considered race, along with other partisan and geographic considerations; ... it says little or nothing about whether race played a predominant role comparatively speaking." Ibid.
What was good in Cromartie II should also be good here.
6
Dr. Ansolabehere's Testimony
Finally, the majority cites Dr. Ansolabehere's testimony that black registered voters in the counties covered by District 12 were more likely to be drawn into District 12 than white registered voters and that black registered Democrats were more likely to be pulled in than white registered Democrats. Ante, at 1477 - 1478.
There is an obvious flaw in Dr. Ansolabehere's analysis. He assumed that, if race was not the driving force behind the drawing of District 12, "white and black registered voters would have approximately the same likelihood of inclusion in a given Congressional District." App. 2597 (internal quotation marks omitted). But that would be true only if black and white voters were evenly distributed throughout the region, and his own maps showed that this was not so. See id., at 322-328; 1 Record 128-133. Black voters were concentrated in the cities located at the north and south ends of the district and constituted a supermajority of Democrats in the area covered by District 12. See Part III-B, supra . As long as the basic shape of the district was retained, moving Democrats from areas outside but close to the old district boundaries naturally picked up far more black Democrats than white Democrats.
This explanation eluded Dr. Ansolabehere because he refused to consider either the implications of the political strategy that the legislature claimed to have pursued or the effects of the changes to District 12 on the surrounding districts. App. 2578-2582. The result was a distorted-and largely useless-analysis.
IV
Reviewing the evidence outlined above,[20] two themes emerge. First, District 12's borders and racial composition are readily explained by political considerations and the effects of the legislature's political strategy on the demographics of District 12. Second, the majority largely ignores *1504 this explanation, as did the court below, and instead adopts the most damning interpretation of all available evidence.
Both of these analytical maneuvers violate our clearly established precedent. Our cases say that we must " 'exercise extraordinary caution' " " 'where the State has articulated a legitimate political explanation for its districting decision,' " Cromartie II, supra, at 242, 121 S.Ct. 1452 (emphasis deleted); the majority ignores that political explanation. Our cases say that "the good faith of a state legislature must be presumed," Miller, 515 U.S., at 915, 115 S.Ct. 2475 ; the majority presumes the opposite. And Cromartie II held that plaintiffs in a case like this are obligated to produce a map showing that the legislature could have achieved its political objectives without the racial effect seen in the challenged plan; here, the majority junks that rule and says that the plaintiffs' failure to produce such a map simply "does not matter." Ante, at 1479.
The judgment below regarding District 12 should be reversed, and I therefore respectfully dissent.

I concur in the judgment of the Court regarding Congressional District 1. The State concedes that the district was intentionally created as a majority-minority district. See Brief for Appellants 44. And appellants have not satisfied strict scrutiny.

Article I, § 4, of the Constitution reserves to state legislatures the power to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress's authority to "make or alter such Regulations, except as to the Places of chusing Senators."

According to polling data, around 90% of African-American voters have voted for the Democratic candidate for President in recent years. See https://ropercenter.cornell.edu/polls/us-elections/how-groups-voted/groups-voted-2016/ (all Internet materials as last visited May 19, 2017) (in 2016, 88%); https://ropercenter.cornell.edu/polls/us-elections/how-groups-voted/how-groups-voted-2012/ (in 2012, 93%); https://ropercenter.cornell.edu/polls/us-elections/how-groups-voted/how-groups-voted-2008/ (in 2008, 95%); https://ropercenter.cornell.edu/polls/us-elections/how-groups-voted/how-groups-voted-2004/ (in 2004, 88%); https://ropercenter.cornell.edu/polls/us-elections/how-groups-voted/how-groups-voted-2000/ (in 2000, 90%).

The challengers' failure to do so is especially glaring given that at least two alternative maps were introduced during the legislative debates over the 2011 map, see 2 Record 357-366, 402-411; App. 883-887, though neither party contends that those maps met the legislature's political goals.

Ignoring all of these well-founded reasons supporting the alternative-map requirement, the majority mischaracterizes my argument as, at bottom, resting on the proposition that "little is lost by making suits like this one as hard as possible." Ante, at 1480, n. 15. That is not my view, and it is richly ironic for the Court that announced the alternative-map requirement to accuse those who defend the requirement of erecting illegitimate and unnecessary barriers to the vindication of constitutional rights.

The majority cites Bush v. Vera, 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), as proof that the lack of an alternative-map requirement has not "made any difference" in our past cases. Ante, at 1479. Vera was decided before Cromartie II, 532 U.S. 234, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001), announced the alternative-map requirement, so its failure to mention that requirement is hardly surprising.

The majority accuses me of failing to accord proper deference to the District Court's factual findings and of disregarding the clear-error standard of review, ante, at 1474, n. 8, but that is nonsense. Unlike the majority, I simply follow Cromartie II by evaluating the District Court's findings in light of the plaintiffs' burden. See 532 U.S., at 241, 257, 121 S.Ct. 1452. The heavier a plaintiffs' evidentiary burden, the harder it is to find that plaintiffs have carried their burden-and the more likely that it would be clearly erroneous to find that they have. In this context, we are supposed to presume that the North Carolina Legislature acted in good faith and exercise "extraordinary caution" before rejecting the legislature's political explanation. Miller v. Johnson, 515 U.S. 900, 915-916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). Given that the State has offered a coherent and persuasive political explanation for District 12's boundaries, plaintiffs bear a "demanding" burden in attempting to prove racial predominance. Cromartie II, supra, at 241, 257, 121 S.Ct. 1452. Because the evidence they have put forward is so weak, see Part III-C, infra, they have failed to carry that burden, and it was clear error for the District Court to hold otherwise. See Cromartie II, supra, at 241, 257, 121 S.Ct. 1452 (applying the same clear-error analysis that I apply here).

This same basic shape was retained in the map proposed in the state legislature by the Democratic leadership and in the map submitted by the Southern Coalition for Social Justice. See 2 Record 402, 357.

A fifth district, District 2, appears to touch District 12 at the border of Guilford and Randolph Counties, but only to a de minimis extent.

District 12 was overpopulated by 2,847 people heading into the 2011 redistricting cycle. App. 1115; 2 Record 347.

North Carolina State Board of Elections, 11/02/2010 Official General Election Results-Statewide, http://er.ncsbe.gov/?election_dt=11/02/2010&county_id=0&office=FED&contest=0.

North Carolina State Board of Elections, 11/08/2016 Official General Election Results-Statewide, http://er.ncsbe.gov/?election_dt=11/08/2016&county_id=0&office=FED&contest=0.

As noted, Dr. Hofeller used the results of the 2008 Presidential election as a measure of party preference. In 2008, the Democratic candidate for President was then-Senator Barack Obama, the first black major party Presidential nominee, and it is true that President Obama won a higher percentage of the nationwide African-American vote in 2008 (95%) than did the Democratic Presidential candidates in 2000 (90%), 2004 (88%), and 2016 (88%). See supra, at 1488, n. 3. But as these figures show, the correlation between race and political party preference was very high in all these elections. Therefore, the use of 2008 statistics does not appear to have substantially affected the analysis.

Even two alternative redistricting plans offered prior to the enactment of the 2011 map-one submitted by the Southern Coalition for Social Justice and the other submitted by Democratic leaders in the state legislature-retained the basic shape of District 12 and resulted in black voters constituting 71.53% and 69.14% of registered Democrats, respectively. 2 Record 361 (Southern Coalition for Social Justice map), 406 (Congressional Fair and Legal map); see also App. 883-887, 2071 (Finding 34), 2145 (Finding 173).

To minimize jargon, I will use the term "precincts" to refer to vote tabulation districts (VTDs). See id., at 1609-1610, for an explanation of VTDs.

The District Court's description of the legislature's political strategy was cursory, and it spent no time analyzing the demographics of the region. See Harris v. McCrory, 159 F.Supp.3d 600, 618-619 (M.D.N.C.2016).

The majority concedes that this is a "thoroughly two-sided case," ante, at 1473, n. 6, yet the majority's opinion is thoroughly one sided. It offers no excuse for its failure to meaningfully describe-much less engage with-the State's political explanation for District 12's boundaries. Instead, it tries to change the subject, accusing me of treating the State's account as essentially uncontested. Ante, at 1473, n. 6. This is a hollow accusation. In this opinion, I lay out the evidence supporting the State's political explanation in Parts III-A and III-B, but I do not accept that account at face value. Instead, I go on to demonstrate that the plaintiffs' contrary arguments are exceedingly weak (Part III-C). Only after considering the evidence on both sides do I conclude that the State's explanation holds up.

That being said, Congressman Watt's testimony was double-hearsay: Congressman Watt testified about what Senator Rucho said someone else said. See App. 1345 (state trial court evidentiary ruling). For unknown reasons, Appellants failed to raise this objection below, but that only means that the testimony was admitted. The weight of that testimony is a different matter, and in general, hearsay should be viewed with great skepticism. Ellicott v. Pearl, 10 Pet. 412, 436, 9 L.Ed. 475 (1836) (majority opinion of Story, J.) (hearsay is "exceedingly infirm, unsatisfactory and intrinsically weak in its very nature and character"); Queen v. Hepburn, 7 Cranch 290, 296, 3 L.Ed. 348 (1813) (majority opinion of Marshall, C.J.) ("Its intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact, and the frauds which might be practiced under its cover, combine to support the rule that hearsay evidence is totally inadmissible"); see also Chambers v. Mississippi, 410 U.S. 284, 298, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

Significantly, while the District Court doubted Dr. Hofeller's contention that politics, not race, dictated the boundaries of District 12 and that Dr. Hofeller was unaware of the relevant racial demographics in the region, see 159 F.Supp.3d, at 619-620, and n. 8, it did not dispute that only political data was displayed on his screen when he drew the district. The state trial court expressly found that only political data was displayed on Dr. Hofeller's screen. See App. 2150 (Finding 188).

The District Court relied on other evidence as well, but its probative value is so weak that even the majority does not cite it.